**GREENPEACE, et al., Plaintiffs,**

**v.**

**NATIONAL MARINE FISHERIES SERVICE, et al., Defendants.**

**No. C98–492Z.**

United States District Court,
W.D. Washington.
at Seattle.

July 13, 1999.

Patti A. Goldman, Earthjustice Legal Defense Fund, Seattle WA, Peter Van Tuyn, Trustees for Alaska, Anchorage, AK, Eric Paul Jorgensen, Douglas A. Ruley, Earthjustice Legal Defense Fund, Juneau, AK, for plaintiffs.

Brian C. Kipnis, U.S. Attorney's Office, Seattle, WA, Michael J. Robinson, Anthony P. Hoang, U.S. Dept. of Justice, General Litigation Section—Environment Division, Washington DC, Lyn Jacobs, U.S. Dept. of Justice, Environmental & Natural Resources, Washington DC, for defendants.

Jay H. Zulauf, Christopher s. McNulty, Mundt, MacGregor, Hapel, Falconeer, Zulauf & Hall, Seattle WA, for At–Sea Processors Association, et al., for intervenor-defendants.

James Alexander Smith, Jr., Smith & Leary, Seattle WA, George J. Mannina, Jr., Gary C. Adler, O'Connor & Hannan, Washington DC, for Westward Seafoods, Inc., et al.

Linda Rae Larson, Heller, Ehrman, White & McAuliffe, Seattle WA, for United Catcher Boats.

Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle WA, Michael A.D. Stanley, Juneau AK, for Aleutians East Borough, et al.

## AMENDED ORDER

ZILLY, District Judge.

### I. INTRODUCTION

The Gulf of Alaska (GOA) and the Bering Sea/Aleutian Islands region (BSAI), collectively referred to as the North Pacific ecosystem, is home to the largest commercial fishery in the United States. This region is also home to the western population of Steller sea lions, which were listed under the Endangered Species Act (ESA) as a threatened species in 1990 and reclassified as endangered in 1997. This case arises out of the complex and difficult-to-assess interaction between the fisheries and the Steller sea lion population.

The federal defendants in this case are subject to the complicated legal dictates of the ESA, the National Environmental Policy Act (NEPA), and the Magnuson–Stevens Fishery Conservation and Management Act (Magnuson Act). Pursuant to the Magnuson Act, the North Pacific Fisheries Management Council (Council) authorizes Fishery Management Plans (FMPs) which regulate all aspects of the fisheries in the GOA and BSAI. Under the ESA, the National Marine Fisheries Ser-

vice (NMFS) must consult, either formally or informally, to ensure that these FMPs are not likely to jeopardize the continued existence of the Steller sea lions, nor to modify their critical habitat. NEPA requires that environmental information is made available to decision-makers, including the Council and the Secretary of Commerce, as well as to the public, for use in such decision-making as the creation and amendment of the FMPs.

Plaintiffs[1] filed suit against NMFS and William M. Daley, Secretary of Commerce (collectively NMFS), in April 1998, challenging the 1998 North Pacific Fishery Management Plans under both the ESA and NEPA. Representatives of the fishing industry intervened (collectively intervenors or industry)[2]. The Court granted additional environmental organizations leave to file amicus briefs in support of plaintiffs.[3] The focus of the litigation has now shifted to the parameters of the 1999 fisheries in the GOA and BSAI. In particular, plaintiffs and intervenors challenge determinations made in NMFS's Biological Opinion issued December 3, 1998 regarding the 1999–2001 atka mackerel fishery and the 1999–2001 pollock fisheries.[4] S1–55. Plaintiffs and intervenors also challenge the "Final Reasonable and Prudent Alternatives" passed by the Council and approved by NMFS. Finally, plaintiffs challenge the legal adequacy of the Supplemental Environmental Impact State-

ment (SEIS), issued on December 18, 1998, regarding the North Pacific fisheries.[5]

This matter currently is before the Court on cross-motions for summary judgment: plaintiffs' motion, docket no. 181, defendants' motion, docket no. 184, and intervenors' motion, docket no. 187. On May 13, 1999, the Court heard argument on these motions and took the matter under advisement in order to carefully study the issues presented. Having considered the arguments of counsel, the motions, all materials filed in support and in opposition, the amicus briefs, and the record in this case, the Court hereby GRANTS in part and DENIES in part the motions of plaintiffs, defendants, and intervenors.

## II. BACKGROUND

### A. Steller Sea Lions

Steller sea lions are closely related to other types of sea lions and to fur seals. The genus to which Steller sea lions belong is thought to be at least 3 million years old. Female Steller sea lions average 2.3 meters in length and 263 kilograms weight, while males are somewhat larger, at 2.8 meters and 566 kilograms. Males live to about 20 years old, and females can reach 30 years old. In 1965, the population of the western stock of Steller sea lions was estimated at 230,000 animals.

1. The plaintiffs in this action are Greenpeace, the American Oceans Campaign, and the Sierra Club.

2. The intervenors are Aleutians East Borough, Westward Seafoods Inc., Wards Cove Packaging Company, North Pacific Processors Inc., Nelbro Packaging Company, Unisca Inc., Peter Pan Seafoods Inc., Kodiak Salmon Packers Inc., Alyeska Seafoods Inc., Western Alaska Fisheries Inc., Kanaway Seafoods Inc., Royal Viking Inc., Morning Star LP, Great Pacific Limited Partnership, Alaskan Command Company, Pacific Knight LLC, the city of Unalaska, United Catcher Boats, and At-Sea Processors Association.

3. The "American Amici" are the National Wildlife Federation, International Marine

Mammal Project of Earth Island Institute, the Humane Society, and Defenders of Wildlife. The "Russian Amici" are Sergei Vakhrin, Save the Salmon Fund, North Pacific, the North Pacific Journal, Russian Far East Fisheries Film School, Olga Cherniagina, Kamchatka League of Independent Scientists, and the Pacific Environment and Resources Center.

4. References in this Order to the "BiOp" relate to the Opinion issued December 3, 1998. Prior Biological Opinions will be identified by the year in which they were issued.

5. *See* Notice of Availability of Final Supplemental Environmental Impact Statement, 63 Fed.Reg. 71,285 (1998).

They inhabit coastal areas around the North Pacific Rim, from Southern California to Japan. Before the recent population decline, approximately 75% of the world's population of Steller sea lions were found in Alaska. The majority of Steller sea lions are still found in Alaska, primarily in the Gulf of Alaska and Bering Sea/Aleutian Islands area.

Over the last three decades, however, the population of Steller sea lions in the North Pacific has declined approximately 85%. In 1990, NMFS listed the Steller sea lion as a threatened species under the ESA, and established emergency protective regulations in an attempt to stop the population decline and to begin the process of recovery.[6] In 1993, NMFS designated "critical habitat" for the Steller sea lion, based in significant part on protecting food resources for the sea lions.[7] This critical habitat consists of the area around 40 rookeries and 82 haulouts, which provide areas for reproduction, feeding, rest, and protection from predators and weather.[8] In 1997, based on genetic distinctions, the Steller sea lion species was separated into the western and eastern populations; the western population's status was then changed to endangered. During the 1990s, the rate of decline has slowed to single-digits, but nevertheless continues. AR-125 at 4; S1-236. NMFS has determined that the next twenty years will likely be crucial for Steller sea lion survival and recovery. S1-55 at 60.

### B. Fishing Industry
#### 1. Pollock and Mackerel

The North Pacific is home to the largest commercial fishing industry in the United States. The most abundant fish in the region, and the major component of the North Pacific fishing industry, is the walleye pollock (pollock). Pollock is a bottom-dwelling fish and a member of the cod family. S1-55 at 21. Mature female pollock are approximately 40 cm in length, and males are longer. *Id.* Pollock have a fairly short life-span and a high mortality rate, in part because they are sometimes highly cannibalistic.

The estimated biomass of pollock in the North Pacific ecosystem has fluctuated significantly since the 1960s. In the east Bering Sea, for example, the estimated biomass was less than 2 million metric tons (mmt) in the mid-1960s, rose to nearly 8 mmt in 1971, declined to 4 mmt in 1978, peaked at 14 mmt in 1984, declined to 8 mmt in 1990, increased again to over 12 mmt in 1993, and dropped to 7 mmt in 1997. S1-55 at 25. The fishing effort directed toward pollock has also fluctuated. From 1964 to 1970, the pollock catch in the BSAI rose from approximately 200,-000 to 1 million mt. *Id.* at Fig. 13. In the late 1980s, the total catch peaked at approximately 2.7 mmt. *Id.* A significant portion of this catch came from what later was designated as Steller sea lion critical habitat. *Id.* By the mid-1990s, the total pollock catch in the BSAI had declined to approximately 1.25 mmt, but much of the catch came from within Steller sea lion critical habitat. *Id.* Scientists believe that the pollock population changes stem in large part from climate changes which have effected the rest of the North Pacific ecosystem as well. In part because of

---

6. A threatened species is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). The listing of a species as threatened triggers an obligation of the Secretary to "issue such regulations as he deems necessary and advisable to provide for the conservation of the species." 16 U.S.C. § 1533(d). An endangered species is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

7. Critical habitat are those areas "essential to the conservation of the species" and that "may require special management consideration or protection" in order for the species to survive and recover. 16 U.S.C. § 1532(5)(A)(i).

8. The primary difference between haulouts and rookeries is that only rookeries are used in connection with the reproductive process, including mating, giving birth, and nursing.

these changes, Steller sea lions have become increasingly dependent on pollock as their major source of prey.

In the Aleutian Islands, atka mackerel (mackerel) also form a very significant part of the sea lions' diet. Mackerel are a pelagic, dense schooling fish. They reach a maximum size of 50–55 cm, at age 4 to 6 years. S1–55 at 7. Biomass trends for the atka mackerel are similar to those for pollock: in 1977, the biomass in the BSAI was approximately 300,000 mt. It rose in the early 1980s, fell again, then peaked at approximately 1.3 mmt in 1991. *Id.* at Fig. 2. In the 1990s, the biomass has declined steadily, to approximately 600,000 mt in 1998. *Id.* The amount of mackerel caught has been generally rising since the late 1970s, with a brief peak in the mid–1980s at 30,000 mt, a decline in the late 1980s to approximately 18,000 mt, then sharp and steady growth throughout the early 1990s. *Id.* at Fig. 5. By 1996, the total atka mackerel catch reached nearly 80,000 mt. *Id.* Since 1980, the percentage of the catch occurring in Steller sea lion critical habitat has been almost always above 75%, and in many years was well over 90%. *Id.*

### 2. Legal Parameters

The Magnuson Act provides the legal framework for federal management of the fisheries in the North Pacific. This Act establishes eight Regional Fishery Management Councils, including the North Pacific Fishery Management Council, that have primary responsibility for designing fishery management measures, including the Fishery Management Plans (FMPs) and implementing regulations. The Secretary of Commerce reviews these proposals, and can either approve or disapprove, in whole or in part, those recommendations; the Secretary cannot make changes to the proposals or take action based on a policy disagreement with the Councils' recommendations. The FMPs must specify each fishery's optimum yield, the catch level which would provide the greatest benefit to the nation. The plans must also state how much of that optimum yield can be expected to be harvested by vessels from the United States. Additionally, the FMPs must specify the level of fishing that would constitute overfishing.

The FMPs typically contain a high level of detail concerning all the variables involved in fishing, including Total Allowable Catch (TAC) limits for targeted species, "time and area closures, gear restrictions, by catch limits of prohibited species, and allocation of TACs among vessels delivering to different types of processor groups, gear types, and qualifying communities." S2–350 at 9. With respect to some fisheries, including the atka mackerel fishery, there has been no temporal allocation of the TAC; in other words, the fleet fishes until the TAC is met, and then fishing stops for the year. In other fisheries, the TAC has been allocated among fishing seasons: for example, the 1998 BSAI pollock fishery involves 45% of the TAC being taken in the "A" season, which ran from approximately January 20th to March 20th, and the remaining 55% of the TAC was taken in the "B" season, during September and October.[9] TACs may also be allocated by location, by type of vessel, and by numerous other factors.

### C. Biological Opinions Under the ESA

The ESA imposes on all federal agencies a duty to "insure" that action taken by the agencies does not jeopardize endangered species or adversely modify their critical habitat.[10] Section 7 of the ESA provides

---

9. The BiOp analyzes the effects of the 1998 fishery on the Steller sea lions, and makes recommendations as to how the 1999–2001 fisheries should be conducted to minimize their impact. The ESA claims in this case involve challenges to NMFS's conclusions based on this data, and on the recommendations they make to avoid the problems that occurred with the 1998 fisheries. Thus, the 1998 fisheries data provides the appropriate baseline for this Court's analysis.

10. An action that "jeopardizes" a listed species is one that "reasonably would be expected to reduce appreciably the likelihood of both the survival and recover" of the species.

for the "action" agency to consult with an expert agency to determine whether jeopardy or adverse modification is likely to occur. The final product of a formal consultation is the issuance of a Biological Opinion (BiOp), which sets forth the expert agency's conclusions regarding jeopardy and adverse modification, as well as the reasoning supporting the opinion.

Since the Steller sea lions were first listed as threatened, NMFS's Office of Sustainable Fisheries (the action agency for ESA purposes) has participated in formal and informal consultation with NMFS's Office of Protected Resources (the expert agency), regarding the effect of the fisheries on Steller sea lions.[11] *See* S1–55 at 141 (summarizing previous consultations). These prior consultations considered the role of the fisheries in sea lion population decline, and concluded that the effect of the fisheries on the sea lions was as yet undetermined. *See, e.g.,* AR–34 at 6, 13; AR–36 at 6. All Biological Opinions issued prior to 1998 concluded that the fishery management processes were taking into account the needs of the Steller sea lions, and that the FMPs under review did not depart significantly from prior practices, so they concluded that no jeopardy or adverse modification was occurring. *See, e.g.,* AR–34 at 17–18; AR–36 at 8.

On December 3, 1998, NMFS issued its BiOp on the effect of the 1999–2001 pollock and mackerel fisheries on the Steller sea lions. S1–55. The BiOp set forth at great length the current scientific information about the sea lions, mackerel, and pollock. It acknowledged the continued scientific uncertainty about competition between the fisheries and sea lions. Importantly, however, it discussed new evidence that the mackerel fishery caused localized depletions of available prey in Steller sea lion critical habitat. The Biological Opinion also noted that the Council had taken precautionary action based on this data, by proposing a series of new regulations designed to spread out the mackerel fishery, both spatially and temporally. The BiOp concluded that the proposed changes to the fishery structure as contained in the FMP minimized the risk of localized depletion, and therefore that the mackerel fishery would not cause jeopardy or adverse modification.

For the first time in the lengthy consultation process, however, NMFS concluded that the BSAI and GOA pollock fisheries were likely to result in jeopardy to the Steller sea lions and adverse modification of their critical habitat. While lacking the direct evidence of localized depletion found regarding the mackerel fishery, the BiOp nevertheless found that competition probably does occur between the pollock fisheries and sea lions "because the pollock fisheries: (1) operate in the same areas where sea lions feed; (2) operate during seasons when sea lions may be especially vulnerable to competition and reduction in availability of prey; (3) catch pollock at the same or overlapping depths at which sea lions feed; and (4) catch the same size pollock on which sea lions feed." Def. Mem. in Supp., docket no. 185, p. 16; *see also* S1–55 at 98–111. The BiOp concluded that this competition results in localized depletions of pollock. The BiOp, without clearly and specifically analyzing the proposed pollock fisheries, concluded that the pollock fisheries were likely to jeopardize

50 C.F.R. § 402.02. An action that adversely modifies a species' critical habitat is one that "appreciably diminishes the value of [the] critical habitat for both the survival and recovery" of the species. *Id.* The terms are discussed in more detail, *infra,* Section III(B).

**11.** Although the North Pacific Fishery Management Council makes recommendations regarding amendments to the FMPs, the Secretary of Commerce must approve them before they become final. This structure leads to NMFS's Office of Sustainable Resources being the action agency for ESA purposes. Because most of the decisions are actually made by the Council, however, NMFS's role as expert/consulting agency is more significant to the issues presently before the Court. Thus, references to "NMFS" in this Order, unless otherwise specified, refer to NMFS in its role as expert/consulting agency.

the continued existence of Steller sea lions and to adversely modify their critical habitat.

Federal law requires that once a jeopardy or adverse modification determination has been made, the consulting agency must propose "Reasonable and Prudent Alternatives," which are alternative actions that can be taken consistent with the purpose of the original project but the consulting agency believes would avoid jeopardy or adverse modification. *See* 50 C.F.R. § 402.02. The BiOp therefore proposed three "principles" (temporal dispersion, spatial dispersion, and pollock trawl exclusion zones) for reasonable and prudent alternatives, then gave examples of measures which would fulfill these objectives. On December 13, 1998, the Council approved new measures, which became the "Final RPAs" when the Director of the consulting agency concurred in the proposal on December 16, 1998. *See* S1–56. The Final RPAs included a number of measures proposed in the December 3rd BiOp, but also involved numerous changes.

Both plaintiffs and intervenors now challenge the December 1998 BiOp and the Final RPAs. The plaintiffs and amici support NMFS's jeopardy assessment regarding the pollock fisheries. They contend, however, that the draft and Final RPAs are arbitrary and capricious because they do not apply the governing legal standards and because they do not remedy the problems on which NMFS based its jeopardy assessment. Plaintiffs also challenge the no-jeopardy or adverse modification finding regarding the mackerel fishery, claiming that management measures on which the agency relies for its findings of no jeopardy or adverse modification are even

less adequate than the Final RPAs proposed for the pollock industries. The intervenors support NMFS's determination of no jeopardy from the mackerel fishery, and argue that the existing scientific evidence renders a jeopardy finding for the pollock fisheries arbitrary and capricious. Intervenors further argue that the NMFS has not met its burden of showing that each component of the RPAs is essential and effective for avoiding jeopardy and adverse modification. Finally, the defendants argue that NMFS's determinations in the BiOp are well-reasoned, rationally-based, and "resulted from an intense deliberative process that considered all relevant factors." Def.Mem. in Supp., docket no. 185, p. 1. They also contend "that the RPAs are NMFS's best evaluation of measures that would avoid competition between the fisheries and the sea lions and mitigate the [BiOp's] jeopardy conclusion." *Id.*

**D. Supplemental Environmental Impact Statement**

This case also involves claims by plaintiffs based on the National Environmental Policy Act (NEPA). NEPA requires that an environmental impact statement (EIS) [12] be prepared on proposals for legislation and other major federal actions significantly affecting the quality of the human environment.[13] *See* 40 C.F.R. § 1502.3. The Fishery Management Plans (FMPs), such as those for the fisheries in this case, undisputedly constitute major federal actions requiring an EIS. Accordingly, NMFS published an EIS for the GOA fishery in 1978, in connection with the FMP for that year. AR–19. The Bering Sea EIS was published in 1981. AR–20. These FMPs and their accompanying

---

**12.** An EIS is "an action-forcing device to insure that insure that [NEPA's] policies and goals ... are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the

quality of the human environment." 40 C.F.R. § 1502.1.

**13.** Major federal actions are those which may have significant effects on the environment and which are "potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

EISs address numerous issues, including when, where, and how the fish are caught, TAC levels, bycatch, habitat destruction, socioeconomic issues, and other marine mammals affected.

NEPA requires continuing environmental analysis for changes to ongoing federal actions, such as the dozens of amendments to the FMPs for the North Pacific fisheries. If an agency finds that a change is not substantial, however, it can prepare an Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) rather than a supplemental environmental impact statement (SEIS).[14] The key difference, for present purposes, between an EA/FONSI and an SEIS is that the latter must consider a broad range of alternatives to the proposed federal action, while an EA can simply approve the action as proposed.[15] NMFS had prepared EAs/FONSIs for all prior amendments to the FMPs, and had never prepared an SEIS until December 1998.

During the approximately twenty years since the original EISs were prepared, however, there have been dramatic changes to the North Pacific ecosystem. Steller sea lions were listed as a threatened species nine years after preparation of the original EISs, and the western population was classified as endangered sixteen years after their preparation. In fact, the original EISs considered the Steller sea lion population as being at an optimal sustainable level. This period also saw significant population declines of fur seals, harbor seals, and several species of whales, birds and fish in the North Pacific ecosystem. This area went through a major climate change during this period, which significantly affected the prevalence of various fish species, which in turn affected the focus of the fishing industry. When the original EISs were prepared, the fishing fleet was dominated by foreign vessels; it is now almost entirely composed of American vessels. This change has significantly altered the fishing industry's economic effects on Alaskan communities. The size and capacity of the trawlers used has also increased considerably, which allows more fish to be caught in a shorter amount of time. This highlights only a small fraction of the changes which occurred in the North Pacific in the 1980s and 1990s.

These extensive changes in the North Pacific led to sharp criticism within NMFS over the adequacy of the existing documents for NEPA compliance. Some NMFS employees have urged the preparation of a supplemental EIS since the early 1990s. NMFS did not take its first formal step towards doing so, however, until March 1997, when NMFS issued a notice of intent to prepare an SEIS regarding the BSAI and GOA groundfisheries. AR–7 (62 Fed.Reg. 15,151 (1997)). NMFS announced that the SEIS would "incorporate[ ] the following: The amendments to the groundfish FMPS; the annual process for determining the TAC specifications; and the public process in place for implementing new regulations, revising existing ones, and incorporating new information." AR–7 at 2. After 18 months of preparation, the agency issued a draft EIS for public review and comment in September 1998. The final SEIS (FSEIS) was issued on December 18, 1998. S2–350. It discussed in great detail the new developments re-

---

14. An Environmental Assessment is a concise public document that helps an agency determine whether an EIS is necessary, facilitates preparation of an EIS when one is necessary, and aids in the agency's NEPA compliance. 40 C.F.R. § 1508.9. A Finding of No Significant Impact briefly presents "the reasons why an action ... will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13.

15. The section on alternatives to the proposed agency action is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. This section "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." Id.

garding the North Pacific fisheries, from the changes in the way the fisheries occur to the listings of the Steller sea lion and several other species under the ESA, to the new scientific information obtained since the prior EISs had been prepared. The critical "alternatives" section of the FSEIS, however, analyzed this information only under a range of alternative TAC levels. Plaintiffs contend that this narrow scope violates NEPA; the defendants argue that this approach fulfills their NEPA obligations.[16]

### III. Endangered Species Act Claims

#### A. Standard of Review

 Challenges to Biological Opinions issued pursuant to ESA Section 7, 16 U.S.C. § 1536, are reviewed under the Administrative Procedures Act ("APA") to determine whether the Biological Opinion was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *See Bennett v. Spear*, 520 U.S. 154, 174, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522 (9th Cir.1998). In determining "whether an agency decision was 'arbitrary or capricious,' the reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct.

2856, 77 L.Ed.2d 443 (1983). An agency action is also arbitrary when it fails "to articulate a satisfactory explanation for its action." *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479, 482 (W.D.Wash.1988). "In applying [the arbitrary and capricious] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 703 (9th Cir.1996).

 "Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving engineering and scientific matters." *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir. 1989). When scientific evidence is equivocal, a court is to defer to an agency's reasonable interpretation of that evidence. *Central Ariz. Water Conservation Dist. v. United States EPA*, 990 F.2d 1531, 1540 (9th Cir.1993). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378, 109 S.Ct. 1851. "The deference a court must accord an agency's scientific ... expertise is not unlimited, however. Thus the presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned." *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 679 (D.D.C. 1997). *See also Northern Spotted Owl*, 716 F.Supp. at 482 ("Judicial deference to agency expertise is proper, but the Court will not do so blindly.").

#### B. ESA Obligations

The ESA imposes on all federal agencies a duty to insure that their actions will not "jeopardize" endangered species or "ad-

---

**16.** The intervenors do not raise NEPA claims.

versely modify" their critical habitat. The statute does not define "jeopardize," but the implementing regulations provide:

> Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.

50 C.F.R. § 402.02. The regulations also define "adverse modification:"

> Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02. The Biological Opinion correctly cites these definitions, and the parties agree that they provide the relevant legal standards by which to evaluate the BiOp.[17]

■ To effectuate the ESA's duty to avoid jeopardy and adverse modification, the Act provides for consultation by an expert agency, to evaluate the consequences of a proposed action on a listed species. 16 U.S.C. § 1536(a)(2).[18] The expert agency then prepares a Biological Opinion, which sets forth the expert agency's:

> opinion, and a summary of the information on which the opinion is based, de-

tailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the [expert agency] shall suggest those reasonable and prudent alternatives which [it] believes would not violate subsection (a)(2) of this section and can be taken by the Federal agency . . . in implementing the agency action.

16 U.S.C. § 1536(b)(3)(A). In this case NMFS's Office of Protected Resources prepared a Biological Opinion on the 1999–2001 BSAI and GOA fishery management plans.[19] This December 1998 BiOp constitutes the final agency action for purposes of judicial review pursuant to the APA. *Bennett,* 520 U.S. at 178, 117 S.Ct. 1154.

**C. Pollock Fisheries Jeopardy Assessment**

To logically evaluate the ESA issues presented, the Court must begin by considering the pollock fishery jeopardy determination. Plaintiffs and defendants argue that the Court should uphold this determination. The intervenors, however, contend that NMFS failed to make the pollock jeopardy determination "based on the best scientific and commercial data available," as required by 16 U.S.C. § 1536(a)(2). Specifically, the intervenors contend that: (1) NMFS failed to consider relevant information contrary to its conclusion, (2) the existing scientific data does not support NMFS's conclusion, and (3) the method used in the Biological Opinion is merely speculation based on an absence of data. Each contention is discussed in order.

---

**17.** Plaintiffs' contention that NMFS failed to apply this definition by analyzing adverse modification and jeopardy separately will be discussed *infra,* Section III(E)(2).

**18.** Section 1536(a)(2) provides: "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any

endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical. . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available."

**19.** *See supra* footnote 11 for a precise explanation of the expert-consulting agency structure in this case.

### 1. Evidence Regarding Lack of Appropriate Prey and Climate Change

■ Industry contends that the Steller sea lion decline is caused by environmental changes and the resulting lack of appropriate prey. *See* Int. Mem. in Supp., docket no. 188, p. 3–5. They further contend that there is "growing agreement in the scientific community that this general collapse is not associated with fishing activities but is due to a reduced 'carrying capacity' of the North Pacific ecosystem as a whole." *Id.* at 4. They argue that NMFS's treatment of these issues in the Biological Opinion violated the ESA both by failing to use the best scientific data available and by reaching arbitrary and capricious conclusions based on the available data.

These challenges must fail under the prevailing legal standards. The Biological Opinion stated that environmental changes may have contributed to the decline, which may have multiple causes. S1–55 at 72–73. The BiOp concluded, however, that: "[t]he existence of a strong environmental influence on sea lion trends does not rule out the possibility of significant fisheries-related effect." *Id.* at 73. Similarly, the BiOp noted that:

> The amount of [diet] diversity has varied considerably and may be an important factor ... but clearly sea lions are not limited to the extreme of only one prey type.... In spite of any debate about the nutritional value of pollock, the fact remains that pollock is a major prey of sea lions. Simply put, sea lions eat, and therefore depend, on pollock. In the present context, the question to be addressed is whether fishery removal of pollock from critical habitat is to the sea lions' advantage, disadvantage, or of no particular consequence.

*Id.* at 73–74. Although the intervenors point to scientific testimony disagreeing with NMFS's conclusion, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

NMFS considered and rejected the theory favored by the intervenors. This rejection was not arbitrary and capricious.

### 2. Evidence Supporting Competition Theory

■ Similarly, the Court rejects intervenors' contention that NMFS's conclusion was not based on sufficient scientific evidence. NMFS based its jeopardy determination on the theory that sea lions and the fisheries "compete" with each other for available prey. *See* S1–55 at 75–82, 98–111. In support of this theory, NMFS relied on scientific evidence establishing a significant overlap between the size of pollock taken by the fisheries and that consumed by the Steller sea lions. *Id.* at 76–78. Specifically, NMFS found that sea lions consume a wide range of pollock, including the larger pollock targeted by the fishery. Further, NMFS concluded that biomass consumed at each length, rather than number consumed of a given size, was the relevant measure for dietary significance. *Id.* NMFS also found that the fisheries catch pollock at the same or overlapping depths at which sea lions feed, relying on studies of sea lion foraging patterns and of fishing industry practice. *Id.* at 78–79. The agency found that the fisheries operated extensively in sea lion critical habitat. *Id.* at *e.g.* 27–28. Additionally, much of the fishing activity in sea lion critical habitat occurs in the winter months; NMFS relied on scientific evidence that sea lions are particularly vulnerable to competition during this period. *See id.* at 79–80. Finally, a key new study showed that the mackerel fishery was causing localized depletions of prey, for similar reasons. *Id.* at 17–20. Thus, the Biological Opinion relied on significant evidence that the pollock fisheries were competing with the Steller sea lions for prey, at times which were particularly likely to harm the endangered species.

### 3. Methodology

■ NMFS acknowledged that this scientific evidence is not "conclusive." *Id.*

at 99. The ESA, however, only requires that decisions be made on the basis of "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). This standard requires "far less" than conclusive proof. *See Defenders of Wildlife,* 958 F.Supp. at 680. In fact, Congress intended that agencies give "the benefit of the doubt to the species." *Conner v. Burford,* 848 F.2d 1441, 1454 (9th Cir.1988) (citing H.R.Conf.Rep. No. 96–697, at 12, reprinted in 1979 U.S.C.C.A.N. 2572, 2576). One of the express purposes of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). NMFS did so by evaluating the best evidence currently available and concluding that jeopardy and adverse modification were likely to occur.

▮▮▮ Besides the specific evidence discussed above, the Biological Opinion supported its jeopardy assessment by a two-step approach. First, it considered a number of potential non-fishery causes for the Steller sea lions' decline: predation, disease, toxic substances, oil and gas or mineral development, disturbance by non-fishing activities, research, commercial and/or subsistence harvest of sea lions, natural environmental changes, and prey quality. S1–55 at 66–74. Based on consideration of the scientific evidence related to these factors, the BiOp concluded that these factors were not likely to be major causes of the decline, and/or that they were not likely to still pose significant impediments to recovery. *Id.* Having thus eliminated non-fishery related causes for the decline, and acknowledging that no data conclusively established a positive or negative impact from the fisheries on Steller sea lions, NMFS then turned to three "assumptions:" (1) "the abundance of any species in a particular space at a particular time is finite;" therefore removing hundreds of thousands of tons of fish per day must, "at least on a very local scale and for short periods of time, reduce the biomass of the

[remaining] targeted fish;" (2) the likelihood of localized depletions rises when fish are patchily distributed, as pollock are; and (3) "[i]f the reductions in schools of pollock or mackerel occur within the foraging areas of the endangered western population of Steller sea lions, the reduced availability of prey is likely to reduce the foraging effectiveness of sea lions." *Id.* at 100. The BiOp then detailed the evidence supporting these assumptions, and concluded that based on the available data and the reasonable assumptions, jeopardy and adverse modification were likely to occur.

Such an approach can hardly be considered arbitrary and capricious. NMFS examined a number of other potential causes for the Steller sea lions' decline. They evaluated a great deal of evidence indicating that the fishery was competing with the sea lions for prey during critical times of the year, especially in light of the three reasonable assumptions discussed above. NMFS found that although the fishery may not be the sole cause of the decline, nor the sole factor preventing recovery, the fishery was nevertheless likely to jeopardize the continued existence of the Steller sea lion population. In so finding, NMFS provided a reasonable interpretation of equivocal evidence, to which this court must defer. *See Central Ariz.,* 990 F.2d at 1540. Accordingly, plaintiffs and NMFS are entitled to summary judgment upholding the determination that the pollock fisheries in the GOA and BSAI were likely to result in jeopardy and adverse modification.

**D. Mackerel Fishery Finding of No Jeopardy**

▮▮▮ The plaintiffs argue that the same evidence on which NMFS relied to find jeopardy for the pollock fisheries compels a similar finding for the mackerel fisheries. In fact, plaintiffs contend, the evidence is even stronger in the latter context: the only study to find occurrences of localized depletion concerned the mackerel fishery. *See* S1–55 at 17–19. The plaintiffs thus

argue that the BiOp's conclusion that the mackerel fishery is not likely to cause jeopardy or adverse modification is arbitrary and capricious. Instead of analyzing the relevant differences, or even providing any comparative discussion of the two fisheries at all, the BiOp simply set forth a great deal of data, then stated its conclusions, without making its reasoning explicit. After reviewing the Opinion closely, however, the Court concludes that the Biological Opinion provided a rational basis for the different treatment of the effect of the pollock and mackerel fisheries on the Steller sea lions.

First, the pollock fishery accounted for a much larger percentage of the overall groundfish catch in the BSAI than did the mackerel fishery. *Compare* S1–55 Figs. 11 and 7.[20] Secondly, the two fisheries have historically been conducted very differently. The mackerel fishery has involved a single season, with 100% of the total mackerel TAC taken between January and late March or early April. *Id.* at 103. The BSAI pollock fishery, in contrast, has been split between two seasons, with more than half of the catch occurring in September and October. *Id.* at 115. The spatial allocation involved is different as well. The mackerel fishery is broken up into three distinct management areas; fishing begins in the easternmost subarea, then moves westward through the other two. *Id.* at 8. The pollock fishery does not operate under similar spatial-management measures.

Most importantly, however, in early 1998, the North Pacific Fishery Management Council considered the evidence of localized mackerel depletion and proposed significant changes to the mackerel fishery, while no such changes were made regarding the pollock fishery. Beginning in 1999, the mackerel fishery will be split into two seasons, with the TAC split evenly between them. *Id.* at 104. This measure will therefore cut in half the total number of mackerel taken during the critical winter months.[21] Additionally, the percentage of mackerel caught in sea lion critical habitat will be reduced from the recent levels of 70–98% to 40% by 2002. These changes spatially and temporally distribute the mackerel fishery, and represent significant changes from the status quo that was found to result in localized depletions. These measures are also similar to the changes that NMFS proposed for the pollock fishery as RPAs.

The Biological Opinion could be written much more clearly. Nevertheless, when viewed under the deferential "arbitrary and capricious" standard, the BiOp contains enough information to justify the no-jeopardy conclusion reached for the mackerel fishery. This conclusion finds further support in the administrative record, particularly in the Environmental Assessment prepared for NEPA compliance, on the environmental effects of the proposed changes to the mackerel fishery on the Steller sea lions. *See* AR–28. Defendants and intervenors are therefore entitled to summary judgment upholding the determination that the mackerel fishery is not likely to cause jeopardy or adverse modification.

**20.** The BiOp's presentation of this information is confusing and opaque at best. The 125 pages of text never include TAC levels for the BSAI; instead, the information is only given in percentages—*e.g.* the percentage increase or decrease from prior years, percentage of TAC taken from critical habitat, etc. Such a presentation makes it very difficult for a reviewing court to understand the agency's decisions and to assess their legal sufficiency. Neither has the government's brief always helped the court, because its citations to the record on critical points are sometimes inaccurate. *See, e.g.*, Def.'s Resp., docket no. 205, p. 3 (citing as authority for BSAI TAC levels a chart dealing with total catch in the GOA).

**21.** The second season will occur in September through October or November. AR–28 at 32; S1–55 at 104. This division of the mackerel fishery into two seasons provides a much more significant change from 1998 practices than does the division of the pollock fishery into A1 and A2 seasons. *See* Part III(E)(2) & (3), *infra.*

## E. Pollock Fisheries Reasonable and Prudent Alternatives

Broadly speaking, "reasonable and prudent alternatives" (RPAs) are the solutions to the problems inherent in a proposed federal action which lead the consulting agency to find that the action will result in jeopardy. Specifically, the ESA provides, "If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) of this section and can be taken by the Federal agency or applicant in implementing the agency action." 16 U.S.C. § 1536(b)(3)(A).[22] Further definition of the term "reasonable and prudent alternatives" is found in the regulations:

> Reasonable and prudent alternatives refer to alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.02. This definition contains four distinct requirements for any valid RPA: it must (1) be consistent with the purpose of the underlying action; (2) be consistent with the action agency's authority; (3) be economically and technically feasible; and (4) "avoid the likelihood" of jeopardy or adverse modification. Plaintiffs contend that the draft and final RPAs violate the fourth prong of this definition; the intervenors argue that the RPAs violate the third prong. Defendants argue in support of the RPAs.

### 1. Defining "RPAs" Being Reviewed

In evaluating these challenges, the Court must define what constitutes the RPAs under review. In this case, that is a somewhat complicated question for a number of reasons. The Biological Opinion contains proposes solutions at various levels of generality. The BiOp sets forth three principles that any reasonable and prudent alternative must accomplish: (1) temporal dispersion of the fishery; (2) spatial dispersion of the fishery; and (3) protection of rookeries and haulouts by implementation of additional no-trawl zones. S1–55 at 114–120. Within the discussion of each general principle, the BiOp then provides more specific goals which "must" be accomplished, for example "[d]istribute the pollock trawl harvest into at least four seasons (two in the period of January through May and two in the period from June through October)." *Id.* at 117. The case also involves "draft" and "final" RPAs; the former are found in the December 1998 BiOp, while the latter are the emergency measures that the North Pacific Fishery Management Council adopted ten days later in response to the BiOp. *See* S1–56 (memorandum from Director of action agency to Director of consulting agency outlining changes; signed concurrence by consulting agency).

The parties discussed these issues at oral argument. The Court agrees with the parties' consensus that the Court should evaluate the management measures as a whole for compliance with the four-prong standard for evaluating RPAs. This represents the middle ground between defining the RPAs as either the three general principles mentioned above or looking at each individual management measure in isolation. There is no serious dispute over the appropriateness of the three general principles; the dispute centers instead over their implementation. On the other hand, looking at the effectiveness of each

---

**22.** Subsection (a)(2) requires the secretary to review agency action to determine whether

jeopardy or adverse modification will result.

specific measure or its scientific and economic feasibility would provide a distorted view of the situation. It is therefore appropriate to analyze the overall management scheme proposed.

■ The Court also finds that it can consider both the draft and final RPAs in evaluating NMFS's compliance with the ESA. The only substantive analysis of the RPAs found in the record is in the Biological Opinion. The action agency, NMFS's Office of Sustainable Fisheries, prepared a memorandum summarizing the Council's changes. The Director of the consulting agency, NMFS's Office of Protected Resources, then signed the memorandum, thereby indicating her approval of the Council's changes. In other words, the voluminous record does not contain a single sentence reflecting the *reasons* why NMFS found the final RPAs to be adequate. Under these circumstances, the Court looks to the record as a whole, and to the BiOp's section on draft RPAs in particular, to determine whether NMFS acted arbitrary and capriciously.

## 2. Avoiding Jeopardy and Adverse Modification

■ Plaintiffs challenge both the proposed and final RPAs for their failure to analyze jeopardy and adverse modification separately. The ESA requires that each federal agency "shall ... insure that any action ... is not likely to jeopardize the continued existence of any endangered species ... *or* result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(1) (emphasis added). Jeopardy relates to the overall continued existence of a species, and examines the effects of an action on the species.[23] Adverse modification, in contrast,

concerns the effects of an action on the species' critical habitat.[24] Although there is considerable overlap between the two, the Act establishes two separate standards to be considered. *See Conservation Council for Haw. v. Babbitt*, 2 F.Supp.2d 1280, 1287 (D.Haw.1998). NMFS should therefore have analyzed the two separately or provided an explanation for why, in this case, the two could be treated together. *Id.*

■ Although NMFS should thus have applied *both* standards in analyzing the RPAs, NMFS actually failed to apply *either* standard. For example, the BiOp states that one specific goal of spatial dispersion is to reduce the level of catch taken from critical habitat. The ESA requires consideration of what catch levels would "reduce appreciably the likelihood of survival and recovery" of the Steller sea lions, or would avoid "appreciably diminish[ing] the value of critical habitat." 50 C.F.R. § 402.02. The BiOp, however, only looks at what would be "consistent with past fishery practices and still provide[ ] a considerable reduction from the *current*" levels. S1–55 at 118. The Court recognizes the difficult line-drawing issues presented in deciding, for instance, exactly what level of catch inside critical habitat would result in jeopardy or adverse modification. Nevertheless, NMFS must comply with the mandates of the Endangered Species Act, including asking the required questions.

The Council's modifications to the RPAs aggravated this problem. For example, the BiOp stated that temporal dispersion of the winter/spring roe fishery was necessary, and suggested splitting 45% of the winter TAC into two seasons, beginning

**23.** An action results in jeopardy when it "directly or indirectly, ... reduce[s] appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

**24.** Adverse modification is "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species ... [including] alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical." 50 C.F.R. § 402.02.

January 20th and March 1st, respectively. *Id.* at 117, 121.[25] The Council, however, moved the Bering Sea A2 season's starting date to February 20th, and eliminated the A2 season entirely for the Gulf of Alaska. S1–56 at 3, 5. Additionally, the BiOp proposed allocating 20% of the yearly Bering Sea TAC to the A1 season, and 25% to the A2 season. S1–55 at 121. The Council changed the allocation to 27.5% and 12.5%, respectively. S1–56 at 3. Because the BiOp only related its proposed allocations to current practices rather than the standards for adverse modification and jeopardy, it is impossible for the Court to evaluate the changes made by the Council and to review NMFS's approval of these changes. Similarly, NMFS's failure to analyze *either* the draft or final RPAs under the appropriate legal standards makes it impossible for this Court to find that the agency has "*articulated a rational connection* between the facts found and the choice made." *Pyramid Lake*, 898 F.2d at 1414 (emphasis added).

### 3. Fit Between Individual Measures and Principles Guiding RPAs

Furthermore, the plaintiffs correctly argue that several of the individual management measures do not seem to accomplish the RPAs' principles of temporal dispersion, spatial dispersion, and protection of rookeries and haulouts.[26] For example, the BSAI pollock fishery over the last several years has been divided into two seasons: a winter "A" season running from January to March, and a fall "B" season of September and October. S1–55 at 115, 116. In 1998, 45% of the TAC was

allocated to the A season, and 55% was allocated to the B season. *Id.* In finding that the proposed 1999–2001 BSAI pollock fisheries would result in jeopardy, NMFS cited this temporal compression as "of particular concern." *Id.* at 108.

The final RPAs, however, do not seem to disperse the fishery temporally. The new A1 season begins January 20th, the same day that the A season used to begin. The A2 season is scheduled to begin February 20th, with a five-day "stand-down" period in-between. S1–56 at 3, 5. This stand-down period ensures that the A1 season can only last 26 days. The combined annual harvest for the A1 & A2 seasons is set at 40% of the total yearly TAC, with 27.5% allocated to the A1 season. *Id.* If the fishery took the entire 27.5% TAC in A1, as permitted, and trawling occurred at the same rate during A1 and A2, it would only take an additional 11 days to catch the A2 TAC. This in turn would mean that the A1 & A2 seasons would end, with 40% of the yearly TAC taken, by March 2nd. Thus, it seems entirely possible that the final RPA would not lengthen the winter fishery at all; the only dispersive effect would be that 40% rather than 45% of the total TAC would be taken. Further, these figures concern percentages of TAC levels rather than tons of pollock caught. If the Bering Sea TAC was increased from, for example 100,000 metric tons to 150,000 metric tons, fishing under the RPAs would actually result in the removal of more pollock during this period.[27]

 It is possible that this analysis does not consider some other aspect of the

---

**25.** The record reveals that NMFS scientists, when drafting the RPA section of the Biological Opinion, had proposed that the A2 season start even later, on March 15th. S1–40.

**26.** The Court declines the intervenors' invitation to evaluate the RPAs in light of what actually occurred in the 1999 A1 and A2 pollock seasons. The regulations define RPAs in part as measures which the consulting agency believes would avoid the likelihood of jeopardy and adverse modification. 50 C.F.R. § 402.02. The Court must evaluate

whether that belief was arbitrary and capricious. The Court must therefore analyze the RPA's logical effect, viewed when the RPAs were proposed and approved, rather than evaluating the RPAs' actual effect.

**27.** These numbers are illustrative only, and do not reflect the actual TAC levels. As stated in footnote 20, the Biological Opinion does not contain the Bering Sea's TAC levels in metric tons, so it is impossible for the Court to use the correct figures here.

problem, which would explain NMFS's approval of this measure as "consistent with the spirit and intent" of the Biological Opinion. This, however, illustrates the problem discussed in the previous subsection of this Order: NMFS has completely failed to analyze how these individual measures avoid jeopardy or adverse modification. NMFS also has not explained how the various management measures work together. At oral argument, counsel responded to this Court's question about analysis by saying "NMFS is relying on the statistics. We're relying on the numbers...." Tr. at p. 53, ll. 16–17. The record, however, does not demonstrate this reliance. "Where an agency fails to articulate a rational connection between the facts found and the choice made, the Court [or counsel] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Defenders of Wildlife,* 958 F.Supp. at 679 (internal citation and punctuation omitted). Even under the "arbitrary and capricious" standard of review, the government must establish that its RPAs fulfill their purpose of "avoid[ing] the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02. The RPAs in this case may do so, but NMFS has not provided any analysis justifying that conclusion.

NMFS's *ESA Section 7 Consultation Handbook* makes it clear that NMFS must provide such analysis: "When a reasonable and prudent alternative consists of multiple activities, it is imperative that the [biological] opinion contain a thorough explanation of how each component of the alternative is essential to avoid jeopardy and/or adverse modification." AR–18 at 4–41. NMFS must explain how the management measures proposed fit together to accomplish the goal of avoiding jeopardy and adverse modification.[28] Without some rational explanation, the Court cannot conduct a meaningful review. The Court therefore finds the RPAs to be arbitrary and capricious under *Pyramid Lake,* 898 F.2d at 1417, and *Defenders of Wildlife,* 958 F.Supp. at 679. Accordingly, the Court grants plaintiffs summary judgment on their claims regarding the RPAs.

### 4. Scientific and Technical Feasibility

The intervenors contend that the RPAs should also be found to be arbitrary and capricious because NMFS failed to establish that they meet the third part of the definition of an RPA, i.e. that they are "economically and technologically feasible." 50 C.F.R. § 402.02. It remains an open question whether this requirement should be interpreted as referring only to whether the RPA is feasible for the agency, or whether it relates to the effects on third parties.[29] The intervenors, however, contend that NMFS must balance the benefit to the species against the economic and technical burden on the industry before approving an RPA. Such a result would be fundamentally inconsistent with the purposes of the ESA and with case law interpreting the Act. *See, e.g., Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) (enjoining the opening of a nearly completed dam because

---

**28.** The ESA itself may not require explanations of RPAs to contain this level of detail. The *Handbook*'s introduction, however, states that it "establishes national policy for conducting consultation" pursuant to the ESA. AR–18 at 0001b. NMFS may therefore be bound by this higher standard: "Courts have found agencies to have violated the APA by deviating from an announced policy without sufficient reason." *Southwest Center,* 143 F.3d at 523 n. 4. The Court need not decide this issue, however, because NMFS failed to articulate any connection between the facts found and the choices made in the RPAs, or

to provide any explanation demonstrating why "the Director believes [the measures] would avoid the likelihood of jeopardizing the continued existence of [Steller sea lions] or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02.

**29.** *See Westlands Water District v. United States Dept. of Interior,* 850 F.Supp. 1388, 1425–26 (E.D.Cal.1994) (noting but not resolving these arguments).

opening the dam would wipe out all of endangered species' critical habitat). The "guiding standard" for determination of RPAs is jeopardy, *Idaho Dept. of Fish & Game v. NMFS*, 850 F.Supp. 886, 896 (D.Or.1994), *vacated as moot*, 56 F.3d 1071 (9th Cir.1995), not economic impact on third parties such as the fishing industry.[30]

■ This is not to say, however, that NMFS cannot consider industry concerns when shaping RPAs. NMFS must come up with reasonable and prudent alternatives that are consistent with the purposes of the underlying action and the action agency's authority, that are economically and technologically feasible, and which avoid the likelihood of jeopardy and adverse modification. 50 C.F.R. § 402.02. When faced with a range of possible measures that are consistent with this definition, NMFS can pick amongst them based on other factors, including effects on the fishing industry. *Southwest Center*, 143 F.3d at 523; *see also Bennett*, 520 U.S. at 176, 117 S.Ct. 1154 (finding that an important purpose of the "best scientific data" requirement is to avoid needless economic dislocation, and noting that the ESA allows a project to go forward if no RPAs exist and the benefits of the action outweigh harm to the species).

■ These two determinations are separate steps, however, and contrary to intervenors' arguments, they should not be combined. In the present case, NMFS approved changes in management measures based solely on an attempt to minimize the impact on the fishing industry, without explicitly considering what effect the changes would have on the Steller sea lions.[31] Similarly, although NMFS must

explain how the RPAs would avoid jeopardy and adverse modification, they do not have to discuss or recommend every management measure that would achieve these results. The Court therefore rejects intervenors' contention that the RPAs are arbitrary and capricious because they are not economically and technically feasible for the fishing industry.

■ Nevertheless, the intervenors point to examples where NMFS's failure to analyze the RPAs according to the applicable legal standards worked to the intervenors' detriment. For example, the Biological Opinion stated that spatial distribution of the TAC should be based on existing study or management areas. S1–55 at 119. The BiOp then recommended combining the Catcher Vessel Operation Area (CVOA) with the Southeast Bering Sea foraging area, which is critical habitat, to form one management complex. *Id.* Both the foraging area and the CVOA are very large areas; although they overlap substantially, large areas in the CVOA are not Steller sea lion critical habitat. *See* S1–55 at Fig. 9. Unlike most critical habitat, the foraging area at issue here is not simply around rookeries and haulouts—it extends far out to sea. *Id.* The record does not disclose any explanation for treating the two together as a CVOA–CH complex. There is no analysis of how this measure, alone or in combination, is likely to avoid jeopardy or adverse modification, or how it is economically or technically feasible. Although NMFS is not required to pick the best option for the industry any more than for the species, it must provide

**30.** *See also Aluminum Co. of America v. Bonneville Power Admin.*, 175 F.3d 1156, 1162 (9th Cir.1999) (agency's exercise of statutory obligations to consider economic interests can only be accomplished within framework of compliance with environmental mandates.)

**31.** One NMFS scientist's correspondence describes this problem: "[P]rotective measures for [sea lions] appear to be less urgent than

consideration of impacts to the fishing industry. I though that we were still in the role of the consultation agency in deciding what needed to be done for the Stellers and later, as action agency, we would find the best way to implement RPAs with industry concerns in mind. Have I misunderstood the process, or does it appear that several steps are going on at the same time here?" S1–484.

some analysis of the options it selects.[32] The Court therefore finds that intervenors are also entitled to summary judgment that NMFS arbitrarily and capriciously failed to analyze the RPAs under the appropriate legal standards.

### F. Conclusion

In preparing the December 1998 BiOp, NMFS faced an extremely difficult task. The scientific evidence of the fisheries' effect on the Steller sea lion population remained somewhat uncertain. They faced ongoing litigation from both environmental groups and the fishing industry. NMFS also struggled to reconcile Magnuson Act requirements with ESA mandates. The North Pacific ecosystem poses complex scientific and management issues, to which there are no easy answers.

NMFS considered the available evidence and the ESA's legal standards, and concluded that the pollock fisheries were likely to result in jeopardy and adverse modification, while the mackerel fishery was not. The Court finds that NMFS is entitled to summary judgment upholding these determinations.[33]

When assessing the ways to remedy the identified problems, however, NMFS failed to apply the appropriate legal standards or to explain its proposed measures. Instead, NMFS recommended a complicated set of interrelated fishery management measures, which then were modified by the action agency and re-approved by NMFS. The plaintiffs and the intervenors are entitled to summary judgment that NMFS violated the Endangered Species Act by failing to articulate a rational connection between the facts found and the choices made regarding the RPAs.

---

**32.** Similarly, the record does not explain the closure of the Aleutian Islands to pollock fishing. This measure is not found in the Biological Opinion; it first arose as part of the Council's changes to the RPAs, and is part of the final measures adopted. Nothing in the record provides any indication of NMFS's analysis as to whether this measure fulfills the four-

## IV. NEPA CLAIMS

### A. Standard of Review

▮▮▮▮ Compliance with the National Environmental Policy Act of 1969 (NEPA) is reviewed under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Northwest Resource Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1066 (9th Cir.1995). Factual disputes, which implicate substantial agency expertise, are reviewed under the arbitrary and capricious standard, while legal disputes are reviewed under the reasonableness standard. *Price Road Neighborhood Ass'n v. United States DOT*, 113 F.3d 1505, 1508 (9th Cir.1997). "In evaluating whether an agency's [environmental impact statement] complies with NEPA's requirements, we must determine whether it contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 809 (9th Cir.1999) (internal quotation omitted). "In short, we must ensure that the agency has taken a 'hard look' at the environmental consequences of its proposed action." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir.1998).

### B. NEPA Obligations

NEPA "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

NEPA therefore requires that when "proposals for legislation and other major

---

part definition of reasonable and prudent alternatives.

**33.** Plaintiffs are also entitled to summary judgment regarding the pollock fishery jeopardy determination, and intervenors are entitled to summary judgment regarding the mackerel fishery finding of no-jeopardy.

**1270**

Federal actions significantly [affect] the quality of the human environment," the responsible federal agency must prepare a detailed statement which includes the environmental impact of the proposed action, any unavoidable negative environmental effects of the proposal, and alternatives to the proposed action. *See* 42 U.S.C. § 4332(C). This detailed written document is an Environmental Impact Statement (EIS). 40 C.F.R. § 1508.11. An EIS serves "as an action-forcing device to insure that [NEPA's] policies and goals" are taken into account during agency decision-making. 40 C.F.R. § 1502.1. The alternatives section, which should "present the environmental impacts of the proposal and the alternatives in comparative form [in order to] sharply defin[e] the issue," is therefore "the heart of the" EIS. 40 C.F.R. § 1502.14.

NEPA also requires an agency to continue evaluating a project's environmental effects, even after preparation of an initial EIS. The EIS can form the basis for subsequent NEPA documentation, allowing the agency to incorporate by reference prior discussions of general issues and to focus on the specific issues relevant to the subsequent action. *See* 40 C.F.R. § 1502.20. If the agency determines that a subsequent action will not have a significant effect on the environment, it can prepare an Environmental Assessment (EA) and Finding of No Significant Impact (FONSI), and can "tier" these documents off the existing EIS.[34] An EA/FONSI is not sufficient, however, in certain circumstances:

(C) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c).

NMFS prepared environmental impact statements for the GOA and BSAI groundfisheries in 1979 and 1981, respectively. The supplemental EIS was released in December 1998. It updated the scientific information known about the North Pacific ecosystem, and analyzed this information by considering a range of alternative TAC levels under which the fisheries could be conducted. Plaintiffs argue that such a focus violates NEPA by being too narrow. Specifically, plaintiffs contend that NEPA required preparation of an SEIS "of broad scope, with alternatives and analyses that considered and addressed the fisheries' multiple environmental issues and impacts." Pl.Mem. in Supp., docket no. 182, p. 39. Defendants counter that they properly defined the scope of the SEIS and that they considered an adequate range of alternatives.

**C. History of NEPA Compliance/Decision to Prepare SEIS**

In support of their argument that NEPA required preparation of a broad SEIS, plaintiffs rely on the history of NEPA compliance in this case. They point out that the Final Supplemental EIS, which NMFS issued in December 1998, was the first EIS prepared regarding the North Pacific groundfisheries in almost twenty years. Since the original EISs were prepared, significant changes occurred within the fishing industry and the FMPs for the GOA and BSAI were each

---

**34.** The regulations define "Environmental Assessment" in relevant part as "a concise public document ... that serves to ... [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. The regulations define Finding of No Significant Impact as "a document by a Federal agency briefly presenting the reasons why an action ... will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13.

amended more than forty times. The North Pacific ecosystem also underwent major changes, including the steep decline of the Steller sea lion population.[35]

Since the early 1990s, there has been criticism within NMFS regarding the over-all adequacy of the existing documents for NEPA compliance. *See, e.g.,* S2–338, S2–339, S2–347. For example, the record contains a draft letter, written in 1990, stating that the environmental analysis in the original documents "would be considered grossly inadequate by today's standards." S2–338 at 3. Another memorandum, written in 1992, around the time of the emergency listing of the Steller sea lions as a threatened species, called for the preparation of a supplemental EIS, since the existing one treated Steller sea lions as being at "optimum sustainable population levels." S2–339 at 2. Despite these criticisms, however, NMFS did not begin preparation of an SEIS on the groundfisheries until March 1997, when it published a notice of intent to prepare an SEIS.[36] AR–7. In this scoping notice, NMFS relied on the "[n]ew information about the ecosystem, impacts of the fisheries, and management tools" to explain its decision to prepare an SEIS. *Id.* NMFS also noted the major changes made to the FMPs as relevant to its decision to prepare an SEIS *Id.* NMFS therefore seems to have acknowledged that an SEIS was necessary under both the "substantial changes to the action" and the "significant new information" prongs of 40 C.F.R. § 1502.9(c).

## D. Scope of the SEIS

In support of its motion for summary judgment, NMFS relies on the fact that the SEIS undisputedly included a great deal of new "information relevant to environmental concerns and bearing on the

proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). They correctly note that the "Affected Environment" section of the SEIS discussed the various components of the North Pacific ecosystem, updating the information known about each component. For example, the SEIS contains twelve pages on the ESA Section 7 Consultations regarding the Steller sea lion, providing a detailed history of the data available and the actions taken based on that data. S2–250 at 207–218. The SEIS also discussed the changes made to the structure and composition of the fisheries, providing a high level of detail about such things as the various Alaskan communities affected by the fishing industry and the types of vessels used in the industry. *See id.* at 235–274.

The plaintiffs, however, point out that the SEIS *analyzed* this detailed new information, not by looking at a range of alternatives reflecting the broad scope of the FMPs, but instead only under a range of alternatives dealing with one particular aspect of the FMPs: TAC levels. The SEIS considered the environmental effects on the North Pacific ecosystem of using four alternative TAC levels: (A) the status quo method of setting TAC levels annually, for each species complex, within the optimum yield (OY) range based on the biological status of the species and "other ecological and socio-economic aspects of the fisheries"; (B) setting TAC levels at the lower end of the OY range; (C) setting TAC levels at the upper end of the OY range; and (D) no directed groundfishing. S2–350 at 10–11. As a result of this approach, the EIS did not consider how the vast array of new information about the affected environment relates to the other aspects of the fisheries that the FMPs regulate, such as "time and area closures, gear

---

**35.** *See supra* Section II(D) for a more detailed discussion of the extensive changes which had occurred in the North Pacific ecosystem during this period.

**36.** The regulations require an agency to publish in the Federal Register a notice of intent

to prepare an EIS. 40 C.F.R. § 1501.7. This scoping notice should, among other things, invite public participation, determine the breadth and depth of the significant issues to be analyzed in the EIS, and provide a tentative schedule for EIS preparation. *Id.*

restrictions, bycatch limits of prohibited species, and allocations of TACs among vessels delivering to different types of processors groups, gear types, and qualifying communities." *Id.* at 9.

### 1. Federal Action Under Review

The plaintiffs argue that this approach violates NEPA for a number of reasons. NEPA requires preparation of an SEIS when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns;" or when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c). Applying these standards to the present case, plaintiffs argue that the FMPs as a whole, not the method used to set TAC-levels, is "the proposed action" about which there are significant new circumstances and to which substantial changes have been made. Pl.Mem. in Supp., docket no. 182, p. 42. In support of this argument, plaintiffs point to the scoping notice, which indicated that the SEIS would analyze:

> ... decisions about location and timing of each fishery, harvestable amounts, exploitation rates, exploited species, groupings of exploited species, gear types and groupings, allocations, product quality, organic waste and secondary utilization, at-sea and on-land organic discard, species at higher and lower trophic levels, habitat alterations, and relative impacts to coastal communities, society, the economy, and the domestic and foreign groundfish markets.

AR–7 at 2. As prepared, however, the SEIS discussed these issues generally, but did not consider a range of alternatives dealing with them. Plaintiffs argue that by narrowing the range of alternatives to those specifically dealing with TAC levels rather than the FMPs as a whole, NMFS failed to "take a hard look" at the environmental consequences of the agency action, the FMPs.

NMFS responds that the federal action under review in the SEIS was not the FMPs generally, but rather was merely the more limited issue of "setting of TACs in the GOA and BSAI groundfish fisheries." S2–350 at 2. They argue that the scoping notice reflected this narrow focus as well: "NMFS announces its intention to prepare a supplemental environmental impact statement (SEIS) on the Federal action by which the total allowable catch (TAC) specifications and prohibited species catch limits ... are annually established and apportioned." AR–7. A "proposed alternative is reasonable only if it will bring about the ends of the federal action" being considered. *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190 (D.C.Cir.1991). "When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." *City of Angoon v. Hodel,* 803 F.2d 1016, 1021–22 (9th Cir. 1986). Thus, NMFS argues that the range of alternatives was properly tailored to meet this definition of the federal action at issue.

NMFS's argument is legally flawed. Although NMFS contends that the scoping notice and the SEIS clearly establish that the federal action under review was only the setting of TAC levels, both documents are in fact ambiguous on this point. The language quoted above, on which NMFS relies, indicates a narrow scope. On the other hand, the scoping notice also stated that "[t]he SEIS will analyze the *process by which* annual TAC specifications and prohibited species catch limits are determined, together with the procedures for implementing changes to these processes." AR–7 at 2 (emphasis added). The notice then defines "the process" as including the numerous elements relied on by plaintiffs, quoted above.

The SEIS itself reflects similar ambivalency. The section describing the "purpose" of the SEIS detailed the

> changes that have occurred since the
> original EISs were prepared for the

original FMPs (1978 and 1981). These include changes in the following: 1) the BSAI and GOA ecosystems and our understandings of them; 2) the marine species and population frequencies of marine mammal, seabird, and fish in the biological assemblages of the BSAI and GOA; 3) the marine species listed under the Endangered Species Act, some of which may be affected by the BSAI and GOA groundfish fisheries; 4) the information about the biological characteristics of the groundfish stocks; 5) the information about the ecosystem impacts of the fisheries; 6) the fishery management tools that are being used or are available; 7) the characteristics of the groundfish fleets; and 8) the distributions of catch by fleet, area and season. S2–350 at 2. Plaintiffs are correct that this discussion demonstrated a need for a broad SEIS, which analyzed the effect of this myriad of changes on the North Pacific ecosystem. The SEIS then continued: "A programmatic SEIS was developed to analyze and display the effects of the fisheries on the affected human (biological, physical, and economic) environment.... The scope of actions in this analysis includes a range of levels for setting of TACs in the GOA and BSAI groundfish fisheries." S2–350 at 2. This language implies both a broad scope (programmatic SEIS) and a narrow one (scope of action concerns TAC levels). While the SEIS contained language indicating that the federal action under review was merely the setting of TAC levels, the weight of the language pointed to a broader scope.[37]

 Furthermore, as discussed below, a narrow SEIS dealing only with TAC levels would not satisfy NEPA. The FMPs involve "a myriad of interrelated regulations to manage the fisheries." In light of the significant changes to these FMPs and the new information about the broad range of issues covered by these regulations, the Court concludes as a matter of law that NEPA required a broad programmatic SEIS in order to fairly evaluate the dramatic and significant changes which have occurred in the GOA and BSAI groundfisheries.

**2. Cumulative Effects Analysis**

 The plaintiffs correctly argue that NEPA required creation of a document that thoroughly analyzed the cumulative effects of the FMPs:

> Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions.... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. "If several actions have a cumulative environmental effect, this consequence must be considered in an EIS." *Blue Mountain*, 161 F.3d at 1214 (internal quotation omitted). Plaintiffs therefore argue that the SEIS needed to analyze the changes to the FMPs.

Each amendment to the FMPs may have been individually minor and therefore properly dealt with in an EA/FONSI rather than in an SEIS. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992) (1991 amendments too minor to warrant an EIS). Nevertheless, NEPA does not permit NMFS to continue making indi-

---

**37.** Additionally, the SEIS refers repeatedly to the fact that it is a "programmatic analysis" of the fisheries as they affect the environment. *See, e.g.,* S2–350 at 2, & vol. 2 at p. 2. The government's counsel conceded at oral argument that the document should be treated as a programmatic analysis. Tr. at p. 105. Programmatic analyses look to the environmental consequences of a project as a whole, and do not necessarily contain the same level of detail or specificity as a site or project-specific EIS. *See Resources Ltd. v. Robertson*, 35 F.3d 1300, 1306 (9th Cir.1993). Instead, they often form the basis for tiering future NEPA documents focusing on specific facets under review. NMFS's description of the SEIS as "a programmatic analysis" provides further support for the conclusion that the SEIS must be a broad document considering the FMPs as a whole.

vidually minor but collectively significant changes to the FMPs without preparing an SEIS analyzing these changes. "Significance exists [and thus an EIS must be prepared] if it is reasonable to—anticipate a cumulatively significant impact on the environment. Significance cannot be avoiding by ... breaking [an action] down into small component parts." 40 C.F.R. § 1508.27(b)(7). By preparing only EA/FONSIs for each FMP amendment, NMFS tried to avoid "significance" for many years. The Court has no doubt that the vast changes to the FMPs have reached the threshold of "cumulatively significant impact on the environment," thereby requiring preparation of an SEIS addressing these vast changes. For the same reasons, NMFS cannot then break the FMPs down "into small component parts" by analyzing only the setting of TAC levels rather than these FMPs in their entirety. The Court therefore concludes that NEPA's cumulative effects provision requires a programmatic analysis of the FMPs in their current form.

### E. Range of Alternatives Considered
#### 1. Fully Informed Decisions

The Court's determination that the SEIS must be treated as a broad, programmatic analysis of the FMPs as a whole leads directly to its conclusion that the range of alternatives considered was inadequate. One of the goals of the NEPA process is "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of

the human environment." 40 C.F.R. § 1500.2(e). The regulation regarding alternatives, 40 C.F.R. § 1502.14, provides:

> Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), [the alternatives section] should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public.

40 C.F.R. § 1502.14.[38] The SEIS in this case, however, does not "sharply [define] the issues and [provide] a clear basis for choice among options" related to the FMPs. It does not help future decisionmakers assess whether the fisheries should continue to be conducted under the current structure of the FMPs, or whether other alternatives would be more beneficial. The Environmental Protection Agency's final comments on the SEIS correctly note that NEPA's requirement that NMFS "rigorously explore and objectively evaluate all reasonable alternatives," dictates

inclusion of more comprehensive alternatives which look at and programmatically address all elements of the FMP (i.e. location and timing of each fishery, harvestable amounts, exploitation rates, exploited species, groupings of exploited species, gear types and groupings, allocations, product quality, organic waste and secondary utilization, at-sea and on-land organic discard, species at higher

---

**38.** The section further provides that agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

and lower trophic levels, habitat alterations, and relative impacts to coastal communities, society, the economy, and the domestic and foreign groundfish markets) and varies TAC levels outside of the present status quo range.

Pl.Ex. 3 at p. 5, attached to docket no. 182. As written, however, the SEIS does not provide decision-makers with any way of assessing the trade-offs between gear-restrictions and bycatch, for example, or the way that the timing of the various fisheries interact. The difficulty of the issues presented in the Biological Opinion and its Reasonable and Prudent Alternatives highlight the need for consideration of the range of environmental effects of the various regulations contained in the FMPs. One important goal of NEPA is to help "public officials make decisions that are based on understanding of environmental consequences." 40 C.F.R. § 1500.1(c). The SEIS does not provide the information necessary for decision-makers to make fully informed choices. The SEIS is therefore inadequate under NEPA.

### 2. "Practical Analysis" of Fisheries

NMFS contends that by analyzing the fisheries under various TAC levels, the SEIS nevertheless considered the full range of environmental impacts from the fisheries as conducted under the array of regulations contained in the FMPs. Specifically, NMFS argues that this Court should defer to NMFS's determination "that an examination of the fishery under alternative TAC levels would *result in a practical analysis* of the environmental impacts of the fisheries." S2–350 at 3 (emphasis added). NMFS contends that this determination is entitled to substantial deference, and therefore that analysis of alternative TAC levels fulfills NEPA's purpose of ensuring informed decision-making regarding the FMPs in their entirety.

The case law providing for substantial deference to an agency's determination of

the scope of an EIS, however, does not support NMFS's argument. NMFS relies on cases involving deference to an agency's decision about the scope of the federal action under review. *See, e.g., Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (deference to agency's determination that no regional proposal for federal action existed and therefore no regional EIS was necessary); *Marsh,* 490 U.S. at 376–77, 109 S.Ct. 1851 (deference to agency's determination that new information did not require preparation of a supplemental EIS). These cases do not require the Court to defer to NMFS's assertion that an analysis of TAC levels will provide a practical analysis of the fisheries. The SEIS completely lacks any explanation of *why* and *how* analysis of TAC levels "results in a practical analysis" of the impact of the fisheries, as governed by a myriad of regulations. NMFS merely stated: "Analysis of the 'process' or actual procedure employed by the NMFS in developing annual TAC specifications would not be as illustrative of the impacts that could occur to the environment as a result of a change from the current TAC levels under the current baseline." *Id.* Judicial deference to such an unexplained assertion on a critical point would render judicial review meaningless. Even under "arbitrary and capricious" review, the appropriate inquiry is "whether the agency 'considered the relevant factors and *articulated a rational connection* between the facts found and the choice made.'" *Pyramid Lake,* 898 F.2d at 1414 (emphasis added). Here, the government's failure to explain the connection between setting various TAC levels and the impact of other fishery regulations is not entitled to deference, and even if the Court were to defer, the result would be the same. The Court cannot excuse NMFS's total failure to analyze or explain this critical point. The Court concludes that an analysis of the fisheries under various TAC levels was not sufficient to fulfill NEPA's requirements.[39]

---

**39.** This conclusion is even stronger when one

realizes that the three of the four "alterna-

### 3. Programmatic Analysis

██ Clearly, a programmatic analysis would not require consideration of detailed alternatives with respect to each aspect of the plan—otherwise a programmatic analysis would be impossible to prepare and would merely be a vast series of site specific analyses. *See Robertson,* 35 F.3d at 1306 ("specific analysis is better done when a specific development action is to be taken, not at the programmatic level."). The level of detail necessary in an EIS is directly related to the scope of the federal action under review. *California v. Block,* 690 F.2d 753, 761 (9th Cir.1982). Thus, if a multi-step project is proposed that nevertheless has a very broad scope at the initial stage, a high level of detail may be required even in a programmatic EIS. *Id.* at 765. In the present case, however, the programmatic EIS was necessary because of the significant cumulative effects of the amendments to the FMPs over the years, rather than because there were particular new amendments pending. The programmatic EIS should therefore present a more general picture of the environmental effects of the plans, rather than focusing narrowly on one aspect of them.

### F. NEPA Conclusion

The administrative record in this case demonstrates that NMFS's employees faced a very difficult task in preparing this SEIS. The "Affected Environment" section synthesized a great deal of new information regarding the North Pacific ecosystem, and took an important step toward full compliance with NEPA. The Act, however, requires NMFS to analyze the ways in which the groundfisheries effect the North Pacific ecosystem, and to provide decisionmakers and the public with a document that will help further informed decision-making as to the consequences of these plans. The present SEIS, by focusing its analysis only on TAC levels, does not fulfill this mandate. Accordingly, the Court grants plaintiffs' motion for summary judgment as to their NEPA claims, and denies defendants' cross-motion.

## V. CONCLUSIONS

For the reasons discussed above, the Court finds that NMFS did not act arbitrarily or capriciously in concluding that the pollock fishery was likely to jeopardize the Steller sea lions but that the mackerel fishery was not likely to cause such a result. The Reasonable and Prudent Alternatives, however, were arbitrary and capricious on this record because they were not justified under the prevailing legal standards and because the record does not support a finding that they were reasonably likely to avoid jeopardy. The Court further finds that NEPA required preparation of a programmatic supplemental environmental impact statement analyzing the environmental impacts of the FMPs as a whole on the North Pacific ecosystem.

Accordingly, the Court GRANTS plaintiffs' motion for summary judgment, docket no. 181, on their Endangered Species Act claims regarding the pollock fishery's jeopardy determination, and that the Reasonable and Prudent Alternatives are arbitrary and capricious. The Court also GRANTS plaintiffs' motion on their National Environmental Policy Act claim. The Court DENIES plaintiffs' motion in all other respects. The Court GRANTS intervenors' motion, docket no. 187, as it relates to NMFS's failure to analyze the RPAs under the appropriate legal framework, and as to the mackerel fishery no-jeopardy determination. The Court DENIES intervenors' motion in all other re-

---

tives" were closely related to the status quo. As the EPA final comments correctly point out, "Not only were the alternatives limited to variations of TAC, but three of the four existed within the current status quo range: Alternative A maintained the entire range, Alternative B low-balled the existing range, and Alternative C high-balled the existing range. Alternative D, which called for ceasing all fishing activities ... seems unreasonable and therefore unlikely to be considered." Pl.'s Ex. 3 at p. 5, attached to docket no. 182.

spects. The Court GRANTS defendants' motion, docket no. 184, as it relates to the pollock jeopardy determination and the mackerel non-jeopardy finding. The Court DENIES defendants' motion in all other respects.

Pursuant to the ESA, the Court will therefore order a remand of the Biological Opinion to the National Marine Fisheries Service, for preparation of Revised Final Reasonable and Prudent Alternatives consistent with this Order. Pursuant to NEPA, the Court will also enter an order remanding the Environmental Impact Statement to NMFS for action consistent with this Order. The Court directs plaintiffs to serve and file a proposed Order of Remand by July 19, 1999. Objections to the proposed order shall be filed on or before July 30, 1999. The Court SCHEDULES a status conference for Friday, August 6, 1999 at 9:00 a.m. to consider the form of the Order of Remand and to set a briefing schedule in connection with further proceedings consistent with this Order.

IT IS HEREBY ORDERED.