GREENPEACE, American Oceans Campaign, and Sierra Club, Plaintiffs,

v.

NATIONAL MARINE FISHERIES SERVICE, and William M. Daley, in his official capacity as Secretary of the Department of Commerce, Defendants,

At–Sea Processors Association, United Catcher Boats, Aleutians East Borough, and Westward Seafoods, Inc., et al., Intervenor–Defendants.

No. C98–492Z.

United States District Court, W.D. Washington, at Seattle.

Jan. 25, 2000.

Janis Searles, Earthjustice Legal Defense Fund, Juneau, AK, Douglas A Ruley, Earthjustice Legal Defense Fund, Juneau, AK, Peter Van Tuyn, Jack K Sterne, Trustees for Alaska, Anchorage, AK, for Greenpeace, American Oceans Campaign, Sierra Club.

Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, Michael AD Stanley, Juneau, AK, for Aleutians East Borough.

Brian C Kipnis, U.S. Attorney's Office, Seattle, WA, Michael J Robinson, Anthony P Hoang, U.S. Dept of Justice, Gen. Litigation Sec.—Environment Div., Washington, DC, Lyn Jacobs, U.S. Department of Justice, Environmental & Natural Resources, Washington, DC, for National Marine Fisheries Service, William M Daley.

James Alexander Smith, Jr, Smith & Leary, Seattle, WA, George J Mannina, Jr, Gary C Adler, O'Connor & Hannan, Washington, DC, for Westward Seafoods Inc, Wards Cove Packing Company, North Pacific Processors Inc, Nelbro Packing Company, Unisea Inc, Peter Pan Seafoods Inc, Kodiak Salmon Packers, Inc., Alyeska Seafoods Inc, Western Alaska Fisheries Inc, Kanaway Seafoods Inc, Royal Viking Inc, Morning Star LP, Great Pacific Limited Partnership, Alaskan Command Company, Pacific Knight LLC, Unalaska City of.

Linda Rae Larson, Heller Ehrman White & McAuliffe, Seattle, WA, for United Catcher Boats.

Marc Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, Michael AD Stanley, Juneau, AK, for The Aleutians East Borough.

Christopher S McNulty, Mundt MacGregor, Seattle, WA, Eldon V.C. Greenberg, Garvey, Schubert & Barer, Washington, DC, for At–Sea Processors Association.

Claire M Gilchrist, Seattle, WA, Kenneth C Powers, Stock & Moeller, Anchorage, AK, for Sergei Vakhrin, amicus, Save the Salmon Fund, amicus, North Pacific, amicus, North Pacific Journal, amicus, Russian Far East Fisheries Film Studio,

Todd D True, Adam J Berger, Patti A Goldman, Earthjustice Legal Defense Fund, Seattle, WA, Eric Paul Jorgensen,

amicus, Olga Cherniagina, amicus, Kamchatka League of Independent Scientists, amicus, Pacific Environment and Resources Center, amicus.

Richard A Smith, Smith & Lowney, PLLC, Seattle, WA, for National Wildlife Federation, amicus, International Marine Mammal Project of Earth Island Institute, amicus, Humane Society of the United States, amicus, Defenders of Wildlife, amicus.

Jay H Zulauf, Christopher S McNulty, Mundt MacGregor, Seattle, WA, Eldon V.C. Greenberg, Garvey, Schubert & Barer, Washington, DC, for At–Sea Processors Association.

### ORDER

ZILLY, District Judge.

#### I. Introduction

Greenpeace, American Oceans Campaign, and the Sierra Club ("plaintiffs") have filed suit challenging the National Marine Fisheries Service's (NMFS's) North Pacific Fishery Management Plans for the groundfish fisheries in the Bering Sea and Gulf of Alaska. Plaintiffs claim these fisheries are harmful to the endangered Steller sea lion and seek relief under the Endangered Species Act (ESA) and the National Environmental Policy Act (NEPA). In a prior order, the Court ruled on various claims under NEPA and the ESA. *See Greenpeace v. National Marine Fisheries Service*, 55 F.Supp.2d 1248 (W.D.Wash.1999).

The matter is currently before the Court on motions related to plaintiffs' Fifth Claim for Relief. In their Fifth Claim for Relief, plaintiffs challenge the adequacy of a December 22, 1998 biological opinion issued by NMFS pursuant to the Endangered Species Act. The National Marine Fisheries Service moves to dismiss the claim or in the alternative for a temporary stay of litigation pending completion and issuance of a comprehensive "Groundfish consultation." *See* docket no. 285. Interve-

nor-defendants representing the fishing industry (collectively "industry") join in the motion filed by the National Marine Fisheries Service. *See* docket no. 298. Plaintiffs cross-move for summary judgment. *See* docket no. 299.

In reaching a decision on these motions, the Court has considered the pleadings filed in support of and in opposition to the motions, reviewed the litigation to this point, including the prior representations of the parties and rulings of this Court that impact the current motions, and applied the Endangered Species Act to the complex federal management scheme that regulates the North Pacific groundfish fisheries. The Court now DENIES defendant's motion to dismiss, docket no. 285, and GRANTS plaintiffs' motion for summary judgment, docket no. 299.

#### II. Background

The Gulf of Alaska (GOA) and the Bering Sea/Aleutian Islands region (BSAI), collectively referred to as the North Pacific ecosystem, is home to the largest commercial fishery in the United States. The ecosystem is also home to the western population of Steller sea lions which in 1990 were listed under the ESA as a threatened species, and in 1997 were reclassified as endangered.[1]

#### A. Fisheries Management in the North Pacific

The Magnuson–Stevens Fishery Conservation and Management Act (Magnuson Act) provides the legal framework for federal management of the fisheries in the North Pacific. *See* 16 U.S.C. § 1801 *et seq.* Under the Magnuson Act, the North Pacific Fishery Management Council (Council) prepares Fishery Management Plans (FMPs) that regulate commercial fishing in the GOA and BSAI. *See* 16 U.S.C. §§ 1852(a)(1)(G), (h). These FMPs must be consistent with national standards established in the Magnuson Act, 16

---

1. For a detailed description of the relevant legal and factual background in this case, *see*

*Greenpeace v. National Marine Fisheries Service*, 55 F.Supp.2d 1248 (W.D.Wash.1999).

U.S.C. § 1851, and "shall" contain the "conservation and management measures" necessary and appropriate for the conservation and management of the fishery. 16 U.S.C. § 1853(a). "Conservation and management" is defined by the Act to include "all of the rules, regulations, conditions, methods, and other measures" required to rebuild, restore or maintain any fishery resource. 16 U.S.C. § 1802(5). In addition, conservation and management measures must be designed to assure, among other things, that "irreversible or long-term adverse effects on fishery resources and the marine environment are avoided." 16 U.S.C. § 1802(5)(ii).

FMPs must be submitted to the Secretary of Commerce ("Secretary") for review and approval to ensure they are consistent with the dictates of the Magnuson Act and other applicable law. 16 U.S.C. § 1854(a). Similarly, any implementing regulations proposed by the Council under § 1853(c) of the Act are reviewed by the Secretary to determine whether they are consistent with the Act, the FMPs, and other applicable law. 16 U.S.C. § 1854(b).

The groundfish fisheries at issue in this case are regulated under two Fishery Management Plans—one for the Bering Sea and Aleutian Islands and the other for the Gulf of Alaska. S2–350 at 9.[2] According to NMFS, these FMPs "utilize a myriad of interrelated regulations to manage the fisheries." S2–350 at 9. The FMPs address all the factors affecting when, where, and how the fisheries are conducted and include such measures as optimum yield for each fishery, overfishing, total allowable catch limits for targeted species (TAC), time and area closures, gear restrictions, bycatch limits of prohibited species, and allocations of TACs among vessels delivering to different types of processor groups, gear types, and qualifying communities. 16 U.S.C. § 1853; S2–350 at 9.

Since the time of their original implementation, there have been dozens of formal amendments to the North Pacific groundfish FMPs.[3] In addition, discrete annual decisions such as setting the yearly TAC for each fishery, establishing the prohibited species catch limit, and apportioning the TAC into fishing seasons and among various sectors of the industry are implemented by regulation each year. *See* 50 C.F.R. § 679.

### B. Prior ESA Compliance

Under the ESA, all federal agencies must insure that action taken by the agency does not jeopardize the existence or recovery of endangered species or adversely modify their critical habitat.[4] Section 7 of the ESA requires the "action" agency to consult with an "expert" agency to determine whether jeopardy or adverse modification is likely to result from the proposed agency action. The final product of a formal consultation is a biological opinion (BiOp), which sets forth the expert agency's conclusions regarding jeopardy and adverse modification, as well as the reasoning supporting the opinion. *See generally,* 16 U.S.C. § 1536; 50 C.F.R. § 402.14.

Since 1990, when the Steller sea lion was first listed as threatened, NMFS's Office of Sustainable Fisheries (the "action" agency for ESA purposes) has engaged in

---

2. References in this Order to the Administrative Record are either to "AR" (Administrative Record), or to "S" (Supplement to the record), followed by volume number, document number, and page number. For example, S2–350 at 9 refers to volume number 2, document number 350, at page 9 of the Supplement to the record.

3. The GOA FMP was originally adopted in 1978; the BSAI FMP was originally adopted in 1982. *See* AR4–33 at 2; AR4–34 at 2.

4. "Jeopardize" means to "engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Adverse modification" means "a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." *Id.*

both informal and formal consultation with NMFS's Office of Protected Resources (the "expert" agency) regarding the effect of the North Pacific groundfish fisheries on the Steller sea lion and other marine mammals. These consultations have varied in scope from addressing the overall effects of the groundfish FMPs in their entirety, to addressing the effects of discrete amendments to the FMPs or annual catch limits. *See* S3–19 at 100–08.

NMFS has twice before consulted on the environmental effects of the BSAI and GOA groundfish FMPs. In April 1991, NMFS issued two biological opinions addressing the overall impacts of the fisheries on the Steller sea lion and other marine mammals listed under the Endangered Species Act. *See* AR4–29; AR4–30. Each opinion expressly stated that the "Activity Considered" was the "Fishery Management Plan (FMP) for the Gulf of Alaska (GOA) Groundfish" and the "Fishery Management Plan for the Bering Sea/Aleutian Islands Groundfish." *See* AR4–29 at 1; AR4–30 at 1. According to NMFS, each opinion considered "all aspects of the fishery." AR4–29 at 1a; AR4–30 at 1a. Each opinion concluded that "as currently managed and conducted" the respective groundfish fisheries were not likely to jeopardize or adversely modify the Steller sea lion or its critical habitat. *See id.*

In 1995, NMFS reinitiated consultation and, in January 1996, again issued biological opinions that addressed the overall impacts of the North Pacific groundfish Fishery Management Plans on listed species. Like their 1991 predecessors, the 1996 biological opinions expressly considered the "Fishery Management Plan for the Gulf of Alaska Groundfish Fishery" and the "Fishery Management Plan for the Bering Sea and Aleutian Islands Groundfish Fishery." *See* AR4–33 at 1; AR4–34 at 1. Because it had been more than four years since the "overall" effects of the BSAI and GOA groundfish fisheries had been examined, the express purpose of the 1996 biological opinions was to "reconsider" the overall effects of these fisheries on Steller sea lions, "including the adequacy of fishery management regulations to protect them." AR4–33 at 1–2; AR4–34 at 1–2. As in 1991, the 1996 opinions concluded the groundfish management plans for the GOA and BSAI were not likely to jeopardize Steller sea lions or adversely modify sea lion critical habitat.

In 1997, NMFS reclassified the western population of Steller sea lion from threatened to endangered. Nevertheless, in January 1997 NMFS issued a Decision Memorandum that concluded the 1997 fisheries "were not likely to affect Steller sea lions in a way or to an extent not already considered in previous section 7 consultations." S3–19 at 106. In 1998, NMFS concluded "that the 1996 biological opinion remained valid for the 1998 BSAI groundfish fishery." S3–19 at 107. However, due to a 60% increase in the GOA pollock total allowable catch for 1998, NMFS reinitiated consultation on the GOA groundfish fisheries and, in a March 1998 biological opinion, once again concluded the GOA fishery was not likely to result in jeopardy or adverse modification. *See* AR4–36.

## C. Procedural History

In April 1998, plaintiffs filed suit in this Court. Plaintiffs primary allegation in their initial complaint was that NMFS continued to implement the North Pacific groundfish FMPs in the absence of a comprehensive Environmental Impact Statement (EIS) or adequate biological opinions addressing the full, overall impact of these fisheries on the endangered Steller sea lion. *See* Complaint, docket no. 1. Specifically, plaintiffs challenged the January 1996 biological opinion for the BSAI and the March 1998 biological opinion for the GOA. Complaint at 23–27. Plaintiffs claimed these biological opinions did not meet the requirements of the ESA because the "cumulative impacts of the total groundfish catch of multiple species" were not adequately analyzed in the 1996 BSAI opinion, Complaint at 30, and because the 1998 GOA opinion was "limited to consid-

ering a single year, rather than the impacts of the past, present, and reasonably foreseeable fishing under the current management regime." Complaint at 32.

In August of 1998, plaintiffs moved for summary judgment on these claims. Docket 63. In response NMFS moved for a stay of litigation. Docket 68. NMFS argued a stay was proper because it was preparing a new Supplemental Environmental Impact Statement (SEIS) addressing "the Fishery Management Plan for the Bering Sea and Aleutian Islands Groundfish Fishery (FMP BSAI) and the Fishery Management Plan for the Groundfish Fishery of the Gulf of Alaska (FMP GOA)." Defendant's Memo in Support of Stay at 3, docket 69. In conjunction with the SEIS, NMFS represented to the Court that it was consulting on a biological opinion pursuant to section 7 of the ESA that would "examine all Federally-managed fisheries in the BSAI and GOA," including all "the issues that will be addressed in the SEIS." *Id.* at 4.

The statements of NMFS's legal counsel mirrored those of Steven Pennoyer, the Alaska Regional Administrator of NMFS, who submitted a declaration under oath in support of the motion for stay. *See* Pennoyer Declaration, docket no. 69 ("1998 Pennoyer Decl."). In this declaration, Pennoyer stated the scope of the consultation "will be broad and will examine all Federally-managed fisheries in the Gulf of Alaska and Bering Sea and Aleutian Islands and the manner in which the total allowable catch levels are set as well as the issues referenced in [the SEIS]." 1998 Pennoyer Decl. at 4, docket 69. In other words, the promised biological opinion was to be coextensive with the groundfish FMPs, including "a detailed discussion" of the effects of the fisheries on listed species and critical habitat, analyzing among other things,

the process by which the annual total allowable catch specifications and prohibited species catch limits are determined as well as methods by which changes to those processes are implemented ... the locations and timing of

each fishery, harvestable amounts, exploitation rates, exploited species, groupings of exploited species, gear types and groupings, allocations, product quality, organic waste and secondary utilization, species at higher and lower trophic levels, habitat alterations, and relative impacts to the environment. ...

1998 Pennoyer Decl. at 2–3, docket no. 69. NMFS stated it was also engaging in separate consultations under the ESA to address specific changes to the mackerel and pollock fisheries.

Based on these actions, in the fall of 1998, NMFS argued a stay of this litigation was proper because the new "biological opinions and SEIS will supersede and make moot the biological opinions and environmental assessment that are currently the subject of plaintiffs' complaint." Defendant's Memo in Support of Stay at 2, docket 69. On the strength of NMFS's representations regarding its on-going environmental consultations, this Court granted the requested stay. In view of the forthcoming SEIS and biological opinions, this Court concluded "that if we continued now with the pending motion for summary judgment or any other action in connection with the pending litigation at the present time, it would be largely, if not entirely, an academic exercise." Transcript of Hearing on Motion for Stay at 38, docket no. 98.

In December of 1998, NMFS issued the promised documents: a Supplemental Environmental Impact Statement, a biological opinion dealing specifically with the Atka mackerel and pollock fisheries (hereinafter "BiOp1"), and a biological opinion dealing with the entire groundfish fisheries (hereinafter "BiOp2"). Plaintiffs amended their complaint to challenge the sufficiency of these documents under NEPA and the ESA. *See* Second Amended Complaint, docket no. 147.

The legal sufficiency of the SEIS, of BiOp1, and of the final reasonable and prudent alternatives (RPAs) adopted pursuant to BiOp1, were the subject of prior

motions for summary judgment before this Court. In July of 1999, the Court granted in part and denied in part those motions. *Greenpeace*, 55 F.Supp.2d at 1276. The Court ruled that NMFS had properly determined the mackerel fishery as proposed would not result in jeopardy or adverse modification, but that the pollock fishery would. *Id.* at 1276–77. However, the Court held that the RPAs adopted by the Council and approved by NMFS were arbitrary and capricious. *Id.* Furthermore, the Court held that NEPA required the preparation of a comprehensive "programmatic" SEIS. *Id.* The Court remanded for preparation of Revised RPAs and for preparation of a programmatic SEIS.[5] *Id.* at 1277.

### III. The Present Motions

BiOp2 is the focus of the current cross-motions now before the Court. In their Second Amended Complaint, plaintiffs made the same challenges to BiOp2 as they did to the January 1996 BSAI FMP biological opinion and the March 1998 GOA FMP biological opinion, both of which were ostensibly superseded by BiOp2. Specifically, in their Fifth Claim for Relief, plaintiffs claimed that BiOp2 was insufficient under the ESA because it analyzed only the 1999 total allowable catch (TAC) specifications "without adequate discussion or consideration of the likely cumulative impacts of all these fisheries on Steller sea lions." Second Amended Complaint at 23, docket no. 147. *See also* Second Amended Complaint at 30 (alleging that BiOp2 fails to address the individual and cumulative impacts of the groundfish fisheries). Plaintiffs now claim they are entitled to summary judgment "because the Endangered Species Act requires a programmatic biological opinion on the entire groundfish fishery management program," and NMFS has not prepared such an opinion. Plaintiffs' Memo in Support of Summary Judgment at 11, docket 300.

NMFS's motion to dismiss[6] is based on the fact that, subsequent to this Court's order of remand for preparation of revised RPAs and a comprehensive SEIS, NMFS has once again reinitiated consultation on the effects of the entire groundfish management scheme. Defendant's Memo in Support of Motion to Dismiss at 2–3, docket no. 286. Because consultation has been reinitiated, NMFS argues dismissal is proper on the theory that BiOp2 has been "taken back" and, thus, there is no longer any "final agency action" and nothing for this Court to review. *Id.* at 2, 7. In the alternative, NMFS asks for yet another stay of this litigation pending the completion of its renewed groundfish consultation. *Id.* at 2. The industry joins in NMFS's motion. Intervenors' Response to Defendant's Motion to Dismiss, docket no. 298.

### IV. Discussion

#### A. Plaintiffs' Motion for Summary Judgment

Plaintiffs' motion for summary judgment is based solely on the claim that NMFS has failed to prepare a biological opinion that is adequate in scope. Plaintiffs assert that, in order to comply with the ESA, NMFS must prepare a comprehensive, programmatic biological opinion equal in scope to the groundfish FMPs. The industry counters that NMFS has already met this obligation in prior biological opinions and was not required to do so again in BiOp2. Conversely, NMFS argues BiOp2 does address all aspects of the fisheries and is, therefore, legally adequate in scope.

#### 1. Scope of Biological Opinions under the ESA

■ Plaintiffs' correctly assert that NMFS must prepare a biological opinion equal in scope to the FMPs. The Ninth Circuit has unequivocally held that biological opinions under the ESA must be "coextensive" with the agency action. *Conner v.*

---

5. NMFS expects a final SEIS by August 2001. *See* docket no. 327 at 2.

6. NMFS mistakenly titles its moving papers as a Motion to Dismiss Plaintiffs' Fourth Claim for Relief. In fact, plaintiffs' challenge to BiOp2 is its Fifth Claim for Relief.

*Burford,* 848 F.2d 1441, 1458 (9th Cir. 1988). In *Conner,* the Ninth Circuit rejected the argument that a federal agency could meet its ESA obligations by addressing portions of the agency action incrementally as each portion went into effect. *See id.* at 1455. According to the *Conner* Court, the ESA provides a "clear mandate" that a "comprehensive" biological opinion addressing "all phases of the agency action" must be completed before initiation of the agency action. *Id.* at 1453–55. Although *Conner* was decided in the context of oil and gas leases in national forests, its holding is based on a legal interpretation of the ESA and is applicable here.

The ESA requires a biological opinion to detail how the "agency action" affects the species or its critical habitat. 16 U.S.C. § 1536(b)(3)(A). Consequently, the scope of the "agency action" is crucial "because the ESA requires the biological opinion to analyze the effect of the entire agency action." *Conner,* 848 F.2d at 1453. The meaning of "agency action" under the ESA is a matter of statutory interpretation that is ultimately to be decided by the court. *Pacific Rivers Council v. Thomas,* 30 F.3d 1050, 1053–54 (9th Cir.1994). *See also Conner,* 848 F.2d at 1453 (legal adequacy of a biological opinion is tested by matching "agency action" described in biological opinion against a *legal* definition of the term). The Ninth Circuit has consistently held that "agency action" is to be construed broadly. *See Pacific Rivers Council,* 30 F.3d at 1055 (citing cases). Under the ESA, "agency action" means "all activities or programs of any kind" authorized, funded or carried out by federal agencies, including "the promulgation of regulations." 50 C.F.R. § 402.02. Thus, section 7 of the ESA "on its face" requires the agency to analyze all aspects of the agency action in a biological opinion. *Conner,* 848 F.2d at 1453.

In *Pacific Rivers Council,* 30 F.3d 1050, the Ninth Circuit held that the term "agency action" under the ESA included within its meaning Programmatic Land Resource Management Plans similar in nature to the Fishery Management Plans at issue here. In *Pacific Rivers Council,* the Forest Service argued that its resource management plans constituted "agency action" only at the time of adoption, revision, or amendment. *Pacific Rivers Council,* 30 F.3d at 1055. The Forest Service also argued the plans did not fall within the definition of agency action because the plans did not mandate any action but were merely programmatic documents. *Id.* In rejecting the Forest Service's argument, the Ninth Circuit noted that the management plans at issue affected protected salmon "because the plans set forth criteria for harvesting resources within the salmon's habitat." *Id.* Accordingly, the court held that "[g]iven the importance of the [Land Resource Management Plans] in establishing resource and land use policies for the forests in question there is little doubt that they are continuing agency action under § 7(a)(2) of the ESA." *Id.* at 1056. *See also Lane County Audubon Socy. v. Jamison,* 958 F.2d 290, 294 (9th Cir.1992) (interim forestry management strategy is agency action under ESA because it sets forth criteria for harvesting owl habitat); *Silver v. Babbitt,* 924 F.Supp. 976, 984 (D.Ariz.1995) (holding that "a programmatic document that guides and constrains the implementation of a tribal timber harvest program" is agency action under ESA).

■ Similarly, in this case, there is no doubt the FMPs in their entirety, constitute agency action subject to consultation under ESA section 7.[7] By law, fishery management plans contain "all of the rules, regulations, conditions, methods, and other measures" required to maintain the fisheries and prevent long-term adverse

7. The Court notes that the Magnuson Act expressly requires fishery management plans to comply with any other applicable law. 16 U.S.C. § 1854(a). NMFS has previously admitted to this Court that these plans must comply with the ESA, S2–350 at 9, and has twice before consulted on them.

effects on fishery resources and the marine environment. 16 U.S.C. § 1802(5). All regulations implementing the plans must be consistent with them. 16 U.S.C. § 1854(b). By definition, the rules, regulations and other measures that comprise the Fishery Management Plans constitute "agency action." *See* 50 C.F.R. 402.02. The plans as a whole authorize and regulate all the activities involved in fishing. Thus, these plans not only set forth criteria for harvesting resources within sea lion habitat, but guide and constrain all aspects of the groundfish fisheries in the BSAI and GOA. *See Pacific Rivers Council*, 30 F.3d at 1056; *Silver v. Babbitt*, 924 F.Supp. at 984. As such, they have a significant on-going effect on the ocean environment in general, as well as sea lion habitat in particular.

Based on the foregoing, the Court concludes the BSAI and GOA FMPs in their entirety constitute on-going agency action under the ESA. Consequently, the ESA requires a comprehensive biological opinion coextensive in scope with the FMPs.[8]

### 2. Required Scope of BiOp2

Nevertheless, the industry argues BiOp2 is properly limited in scope to addressing the authorization of the 1999 fishery only. *See* Intervenors Response to Motion for Summary Judgment at 8–9, docket no. 326. The industry points out that the adoption of the FMPs and the authorization of the yearly fishery are separate and discrete agency actions. *Id.* They argue that BiOp2 is limited by its terms to the 1999 fishery alone and is not intended to be the comprehensive document that plaintiffs claim is required. *Id.* The industry points out that NMFS addressed the impacts of the FMPs in their entirety in the two

January 1996 biological opinions (described above) and claims these opinions were never challenged. *Id.* at 13. The industry contends these prior opinions fulfill NMFS's obligations under the ESA with respect to the FMPs. *Id.* at 14. As such, the industry claims that NMFS was not currently required to consult on the FMPs. According to the industry, therefore, BiOp2 is properly limited to examining the only pertinent agency action: authorization of the 1999 fisheries.[9] *Id.* at 11.

The industry correctly asserts that decision making under the Magnuson Act distinguishes between the longer term management measures contained in the FMPs, and the seasonal catch limits implemented by regulation annually. Intervenor–Defendants' Response at 8, docket no. 326. The full suite of management measures that comprise the FMPs constitute a "framework" plan which regulates the overall conduct of the fisheries. These "framework" management measures are not revisited annually and any proposed modification to a management plan must be made through formal amendment subject to a strict review process. *See* 16 U.S.C. §§ 1852(h); 1854(a). On the other hand, the implementing regulations also require the Council and NMFS to make certain discrete management decisions annually. These measures are essentially limited to setting the harvest specifications for the year. *See* 50 C.F.R. § 679; 64 Fed.Reg. 12094 (final 1999 GOA specifications); 64 Fed.Reg. 12103 (final 1999 BSAI specifications). The harvest specifications, in turn, consist primarily of setting catch limits for both target and prohibited species, and apportioning these quotas among various sectors of the fisheries and be-

---

**8.** Although NMFS argues it is not required to prepare a "programmatic" biological opinion, it does not seriously dispute the fundamental assertion that it is required to prepare a biological opinion equal in scope to the FMPs. Rather, NMFS seeks to distinguish *Conner* and *Pacific Rivers Council* on the basis it has "complied with this case law by preparing a biological opinion on the entire agency action." Defendant's Response at 6, docket no.

325. However, this argument merely begs the question whether, in fact, BiOp2 is equal in scope to the FMPs.

**9.** This argument necessarily recognizes a difference in the breadth of scope between BiOp2 and the FMPs. Thus, the industry apparently acknowledges that BiOp2 is not coextensive in scope with the FMPs.

tween seasons. *See id.* Thus, authorization of the yearly fishery is an "agency action" of limited scope and duration and stands in contrast to the broad scope and on-going effect of the FMPs.

■ Given the well-defined management scheme prescribed by law, the Court agrees with the industry that the adoption of the FMPs and the authorization of the yearly fishery are separate and discrete agency actions. Nevertheless, the Court rejects the industry's claim that NMFS need not have addressed the entire FMPs in BiOp2. The industry's position is contrary to law and ignores the procedural history of this case.

The fact that BiOp2 is limited by its own terms to the authorization of the 1999 fishery is not dispositive of its proper scope. Ultimately, the meaning of "agency action" is determined as a matter of law by the Court, not by the agency. *Pacific Rivers Council,* 30 F.3d at 1054 (the courts, not the agency, are charged with the basic responsibility of defining "agency action" subject to consultation). Thus, an agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the agency action at issue in a biological opinion.

Contrary to the industry's assertions, prior biological opinions analyzing the overall effects of the entire groundfish management scheme were specifically challenged by the plaintiffs in this case. As detailed above in the procedural history of this case, more than one year ago this Court granted a stay and concluded that ruling on plaintiffs challenges to these prior opinions would be an "academic exercise" based on sworn statements and legal argument that those opinions would be rendered obsolete by the issuance of BiOp2. At that time, NMFS's legal argument and the sworn declaration of its regional administrator made clear that BiOp2 was to be a broad and comprehensive analysis equal in scope to the proposed SEIS. In other words, BiOp2 was to address the full range of management measures that comprise the FMPs and

replace the prior comprehensive 1996 biological opinion for the BSAI and the 1998 opinion for the GOA.

Based on the foregoing, the Court rejects the industry's position that BiOp2 is properly limited in scope to the authorization of the 1999 fishery as opposed to the entire groundfish management plans. To accept the industry's position would, in fairness, require this Court to revive plaintiffs' claims against the January 1996 and March 1998 biological opinions previously challenged, effectively returning this case to a point in the litigation now long since passed. In the process, the Court would have permitted NMFS to manipulate these proceedings and evade judicial review of its fishery management practices by the simple device of failing to live up to the representations it made in open court.

In any event, the January 1996 and the March 1998 biological opinions are no longer legally sufficient. The ESA requires an agency to reinitiate consultation and to issue a new biological opinion when a new species is listed, when the agency action is modified, or when new information reveals the action may affect a listed species in a manner or to an extent not previously considered. 50 C.F.R. § 402.16. In this case, both of the 1996 opinions were issued prior to the listing of the Steller sea lion as endangered. Since the 1996 opinions were issued, significant changes have been made to the fishery management plans and NMFS has concluded the pollock fishery may jeopardize the Steller sea lion. *See Greenpeace,* 55 F.Supp.2d 1248. These changes alone render continued reliance on the 1996 biological opinions legally impossible. Similarly, the March 1998 biological opinion is out-dated. Although it ostensibly reviewed the fishery plan for the GOA in its entirety, the opinion is only 10 pages in length and was necessary only because of a 60% increase in the TAC for 1998. *See* March 2, 1998 Biological Opinion at 7, S4–36.

Based on the law and the prior history of this case, the Court concludes the prop-

er subject of consultation in BiOp2 should have been the overall groundfish Fishery Management Plans for the BSAI and GOA in their entirety. Given the foregoing, the only remaining question is whether BiOp2 is legally adequate in scope.

### 3. Legal Adequacy of BiOp2

Despite the fact that BiOp2 is limited by its terms to consideration of the 1999 fisheries based on the 1999 TAC specifications, NMFS asserts BiOp2 nevertheless addresses the "entire fishery management regime," including all "relevant fishery management regulations or specifications that are in place." NMFS's Response at 4–5, docket no. 325. A review of BiOp2 belies NMFS's assertions.

### i. Standard of Review

Biological opinions issued pursuant to section 7 of the ESA are reviewed under Administrative Procedures Act (APA) standards to determine whether the opinion is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A biological opinion is arbitrary and capricious and will be set aside when it has failed to articulate a satisfactory explanation for its conclusions or when it has entirely failed to consider an important aspect of the problem. While courts must defer to an agency's reasonable interpretation of equivocal scientific evidence, such deference is not unlimited. The presumption of agency expertise may be rebutted if its decisions, even though based on scientific expertise, are not reasoned. *See generally, Greenpeace,* 55 F.Supp.2d at 1259 (citing cases).

In this case, plaintiffs' challenge is solely to the scope of BiOp2. A biological opinion which is not coextensive in scope with the agency action is contrary to law. *See Conner,* 848 F.2d 1441. Similarly, a biological opinion which does not address the full scope of the agency action is arbitrary and capricious because it necessarily fails to consider important aspects of the problem.

### ii. BiOp2 is not Coextensive in Scope with the FMPs

By law, the North Pacific groundfish FMPs are required to contain "all of the rules, regulations, conditions, methods, and other measures" required to rebuild, restore and maintain any fishery resource. 16 U.S.C. § 1802(5). As NMFS itself has stated, the FMPs in this case involve "a myriad of interrelated regulations to manage the fisheries." S2–350 at 9. This comprehensive federal regulatory scheme applies to numerous groundfish species managed under the North Pacific FMPs, including Atka mackerel, pollock, Pacific cod, flathead sole, rock sole, Greenland Turbot, yellow fin sole, Arrowtooth flounder, at least 8 other species of flatfish (e.g., Alaska paice, rex sole, Dover sole, story flounder, English sole, butter sole, sand sole, and deep sea sole), sablefish, numerous species of rockfish, and squid. *See* BiOp2 at 13–57, S3–19.

NMFS's regional administrator has previously indicated to this Court that the scope of a comprehensive biological opinion coextensive with the FMPs would include analysis of the processes by which the annual total allowable catch specifications and prohibited species catch limits are determined, the methods by which changes to those processes are implemented, the locations and timing of each fishery, harvestable amounts, exploitation rates, exploited species, groupings of exploited species, gear types and groupings, allocations, product quality, organic waste and secondary utilization, species at higher and lower trophic levels, habitat alterations, and relative impacts on the environment. 1998 Pennoyer Decl. at 2–6, docket no. 69.

In support of its current motion to dismiss, NMFS's regional administrator declares NMFS is now in the process of preparing a "comprehensive consultation" that will evaluate "the cumulative effects of the fisheries over a multi-year period on listed species and critical habitat," including "the individual and cumulative impacts of all activities relating to groundfish fish-

eries authorized and managed under the FMPS, and all amendments thereto," as well as "overfishing levels; distribution of fishing effort over time and space; fishery methods; direct impacts on target species; incidental impacts on other species including those protected under the Endangered Species Act; cumulative effects of individual fisheries; combined cumulative effects of all fisheries; and mechanisms for assessment of environmental effects." 1999 Pennoyer Decl. at 2–3, docket no. 287.

■ Given the broad and complex nature of the FMPs and the numerous significant issues NMFS itself recognizes these management plans raise, a comprehensive biological opinion addressing the full scope of the FMPs should, at the very least, identify all the relevant management measures and explain how these measures individually, and in combination, affect the listed species and its marine environment. While BiOp2 does mention many of the relevant management measures, it does so only in the context of a general, background discussion. Although useful, general background information does not substitute for focused and meaningful analysis of how the numerous individual management measures, or the management scheme as a whole, affect listed species. Of the issues identified by NMFS itself, BiOp2 fails to meaningfully analyze such things as the processes by which annual catch limits are determined, the methods by which changes to these processes are implemented, the distribution of the fishery over time and space, exploitation rates, overfishing levels, groupings of exploited species, habitat alterations, relative impacts on the environment, individual and cumulative effects of all activities related to the fisheries, direct impacts on target species, incidental impacts on other species, and mechanisms for assessing environmental impacts. *See* 1998 Pennoyer Decl.; 1999 Pennoyer Decl.[10] Rather than discussing each area in which BiOp2 may

be lacking, the Court examines several important issues in which BiOp2's analysis is deficient.

BiOp2 fails to critically analyze how core management measures such as the processes for deriving acceptable biological catch, overfishing, and total allowable catch, impact endangered species. While BiOp2 does include a description of these processes, the discussion is general in nature and does not explain how these measures, or the processes for deriving them, relate to the conservation of the Steller sea lion. *See* BiOp2 at 6–12, S3–19. A proper analysis in this area seems important and necessary. Acceptable biological catch and overfishing levels are based on stock assessment techniques. *See* BiOp2 at 7–9; AR4–34 at 14 (1996 BSAI FMP biological opinion). These levels, in turn, constrain the TAC. *See id.* At least theoretically, therefore, the process ensures that no fish stock will be overfished. *See id.* Nevertheless, in its 1996 BSAI FMP biological opinion, NMFS concluded that "these processes cannot ensure that the amount of food available to sea lions will not be diminished by fishing." AR4–34 at 15. The 1996 biological opinion also stated that the "management process does not adequately incorporate broader ecosystem interactions in determining TAC levels." AR4–34 at 16. As a consequence, the 1996 opinion noted that the only way the management measures can ensure an adequate forage base for marine mammals is to ensure that fish stocks do not fall below historical levels. AR4–34 at 16. Although the 1996 BSAI FMP biological opinion ultimately concluded that TAC setting process probably would not jeopardize the Steller, it did so only after identifying the issues implicated by these measures and discussing them. In contrast, BiOp2 contains no such discussion. BiOp2 does not revisit these questions, does not discuss any changes in the management process that obviate the

10. This list is not intended to be exclusive. There may be other issues not mentioned in

this opinion that require analysis.

concerns previously raised, and does not raise potential new concerns, if any.

Similarly, the 1996 BSAI FMP biological opinion noted that the TAC setting process then in place did "little to improve knowledge of the ecosystem (particularly its responses to management actions) or to test methods to aid the recovery of Steller sea lions." AR4–34 at 16. Perhaps in light of this observation, in his 1998 Declaration to this Court, the regional administrator of NMFS stated that a comprehensive biological opinion (ostensibly referring to BiOp2 itself) would contain analysis of how the methods by which changes to the processes for deriving the TAC and the prohibited species catch limit are implemented. In his 1999 Declaration, NMFS's regional administrator also indicates that mechanisms for assessing environmental impacts should be analyzed. Unfortunately, BiOp2 contains no discussion of these issues.

The overall, cumulative effects of the groundfish fisheries on the sea lion has been a primary issue throughout this litigation. The ESA specifically requires a cumulative effects analysis.[11] Although BiOp2 states that its conclusions are based on a "cumulative effects analysis," BiOp2 at 111, S3–19, and even contains a section titled "Cumulative Effects," BiOp2 at 118, in fact this section contains no analysis whatsoever and is nothing more than a list of the fisheries regulated by the state of Alaska or granted by treaty to Native Americans. BiOp2 at 118–19. The section contains no explanation of how the various groundfish fisheries and fishery management measures interrelate and how the overall management regime may or may not affect Steller sea lions. Significant changes affecting the fisheries and the marine environment have occurred since 1996, when NMFS last consulted on the overall effects of its North Pacific management regime. These changes include reclassification of the western population of Steller sea lions from threatened to endangered, as well as numerous amendments to the FMPs and, for the first time, the issuance of a biological opinion concluding that the pollock fishery could jeopardize the continued existence or recovery of the Steller. As this Court noted with regard to the preparation of a comprehensive SEIS, even minor changes to the FMPs could result in a cumulative significant impact on the environment. *Greenpeace*, 55 F.Supp.2d at 1274. The regional director of NMFS has himself indicated that the individual and cumulative effects of the fisheries require analysis. Yet, BiOp2 fails to address this issue at all.

The requirement that an agency evaluate the effects of its actions on critical habitat is mandatory under the ESA. With respect to this crucial issue, BiOp2 contains no meaningful analysis. BiOp2 states its analysis of this issue was "limited by the lack of available information on the distribution of fishing effort relative to Steller sea lions [sic] rookeries and haulouts and designated critical habitat." BiOp2 at 115. As a consequence, BiOp2 does not even include such basic information as the estimated level of fishing in critical habitat, information that is key to analyzing the effects of fishing in those areas NMFS itself has designated as critical to sea lion recovery and survival. Moreover, NMFS admits that at least some of the information it needed "could be developed after several months of analysis" but the needed analysis "could not be completed in the time allowed for this consultation." BiOp2 at 115. Thus, it appears that necessary data was available but simply not analyzed.

As far as the Court can ascertain, the focus of BiOp2 is limited to analyzing whether the fisheries compete with the sea lion for prey. In particular, BiOp2 focuses on the potential for localized depletions of prey caused by the fisheries. BiOp2 at 90,

---

11. The ESA requires agencies to evaluate the "effects of the action and cumulative effects on the listed species or critical habitat" and to formulate its biological opinion to determine whether the action, "taken together with cumulative effects," is likely to jeopardize the listed species or adversely modify its critical habitat. 50 C.F.R. § 402.14(g)(3) & (4).

112. Even with respect to this limited topic of discussion, meaningful analysis is virtually non-existent. NMFS itself repeatedly concludes in BiOp2 that it simply lacks the information to make any determination one way or the other. *See* BiOp2 at 111–118. Thus, NMFS's analysis is admittedly incomplete and its conclusions inconclusive. Although inconclusive data does not necessarily render a particular scientific conclusion invalid, the limited scope and quality of analysis that is contained in BiOp2 serves to highlight its overall inadequacy. For example, NMFS relies substantially on its conclusion that many of the target groundfish species are not important sea lion prey, despite uncertain evidence. BiOp2 at 114. That many of the target species may not individually constitute a major prey source, however, does not mean the cumulative impact of these fisheries is insignificant. In other words, limited analysis which suggests the fisheries do not jeopardize the sea lion does not obviate the requirement that NMFS address the full scope of the FMPs in order to ascertain their overall effects.

In sum, BiOp2 is limited in scope, heavy on general background information, and deficient in focused and meaningful discussion and analysis of how these large fisheries, and the complex management measures which regulate them, affect endangered Steller sea lions. That NMFS now finds it necessary to undertake yet another "comprehensive consultation" is a final indication to this Court that BiOp2 is not the broad and in-depth consultation it was purported to be by NMFS, much less coextensive in scope with the FMPs as required under the ESA.

A biological opinion which is not coextensive in scope with the identified agency action necessarily fails to consider important aspects of the problem and is, therefore, arbitrary and capricious. Here, BiOp2 not only fails to consider important aspects of the problem, the analysis it does contain is simply not adequate. Although an agency need not rely on conclusive scientific proof in a biological opinion, its conclusions must be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). Thus, an agency "cannot ignore available biological information or fail to develop projections" which may indicate potential conflicts between the proposed action and the preservation of endangered species. *Conner*, 848 F.2d at 1454.

In this case, NMFS admits that at least some of the information it needed was available but could not be analyzed in the time allowed. BiOp2 at 115. A federal agency, however, is not "excused from [fulfilling the dictates of the ESA] if, in its judgment, there is insufficient information available to complete a comprehensive opinion and it takes upon itself [a more limited analysis]." *Conner*, 848 F.2d at 1455. This is not a situation where NMFS fully addressed the problem based on uncertain scientific data. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir.1992). Rather, NMFS entirely ignored relevant factors and admittedly failed to analyze and develop projections based on information that was available.

In sum, the ESA requires a comprehensive biological opinion that addresses the full scope of the agency action—in this case the groundfish fishery management plans in their entirety. BiOp2 was to be that opinion. It is not. Because these management plans constitute on-going agency action, *see Pacific Rivers Council*, 30 F.3d at 1053, the Court concludes NMFS is in continuing violation of the ESA until such time as a comprehensive opinion adequately addressing the full impact of the FMPs is completed.

## B. Defendant's Motion to Dismiss

Notwithstanding the merits of plaintiffs' challenge to BiOp2, NMFS argues plaintiffs' claim should be dismissed as nonjusticiable because it has reinitiated consultation on the overall impacts of the groundfish fisheries and has "withdrawn" BiOp2. NMFS takes a shotgun approach in its briefing, arguing virtually every doctrine of justiciability applies to prevent this

Court from providing the relief plaintiffs seek. *See* Defendant's Memo in Support of Motion to Dismiss, docket no. 286.

As an initial matter, the Court notes that on the one hand NMFS seeks to defend against plaintiffs' motion for summary judgment by pointing to the merits of BiOp2. On the other hand, NMFS argues BiOp2 has been "withdrawn" and plaintiffs' claim should be dismissed. NMFS cannot have it both ways.

■■■ Under Article III § 2 of the Constitution, federal courts are limited to deciding "Cases" or "Controversies." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170, 191 (1997). Standing to sue is an aspect of the case or controversy requirement. *Id.* Generally speaking, in order to have standing, a plaintiff must show an invasion of a legally protected interest that is concrete and particularized as well as actual or imminent. *Id. See also, Resources Limited, Inc. v. Robertson,* 35 F.3d 1300, 1302 (9th Cir.1994) (standing is satisfied where plaintiff has (1) suffered injury in fact, (2) caused by the conduct complained of, and (3) likely to be redressed by a favorable decision). Similarly, ripeness and mootness bear close affinity to standing. A claim is ripe where it has matured sufficiently to warrant judicial intervention. *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1519 (9th Cir. 1992). A claim is moot where the issues presented are no longer "live" or do not present a controversy as to which effective relief can be granted. *Northwest Environmental Defense Center v. Gordon,* 849 F.2d 1241, 1244 (9th Cir.1988).

■■■ A substantive or procedural violation of the ESA gives rise to a legally redressable injury. *See Sierra Club v. Marsh,* 816 F.2d 1376, 1384 (9th Cir.1987). Thus, there is no question that at the time the complaint was filed in the present action a live case or controversy existed and plaintiffs had standing to sue. However, a plaintiff must maintain a live case throughout the litigation. *Doe v. Madison School District No. 321,* 177 F.3d 789, 797 (9th

Cir.1999). Where subsequent events deprive a claim of its character as a live case or controversy, the question is one of mootness. *See id.* at 797–98. *See also Gordon,* 849 F.2d at 1244 ("We have described moot cases as those which have lost their character as present, live controversies."). Appropriately focused, therefore, NMFS's arguments raise only one question: whether NMFS's decision to reinitiate consultation on the groundfish fisheries renders plaintiffs' Fifth Claim for Relief moot.

The burden of demonstrating mootness "is a heavy one." *Id.* at 1244. Because courts of equity have broad discretion in shaping relief, "in deciding a mootness issue, the question is not whether the precise relief sought at the time of the application for an injunction was filed is still available. The question is whether there can be *any* effective relief." *Northwest Environmental Defense Center,* 849 F.2d at 1244–45 (emphasis original). Thus, the fact that the alleged violation has itself ceased is not sufficient to render a case moot. *Id.* at 1245. "As long as effective relief may still available to counteract the effects of the violation, the controversy remains live and present." *Id.*

■■■ The primary fallacy with NMFS's position is its preoccupation with the APA's requirement of final agency action. *See* Defendant's Memo in Support at 7, docket no. 286 (issue is no longer live because NMFS has "taken back" BiOp2 for review); Defendant's Reply at 2, docket no. 313 (issue is no longer "live" because NMFS has reinitiated consultation and, thus, "there is no final agency action" for this Court to review). NMFS provides no legal authority for the proposition that an agency's decision to reinitiate consultation results in the "withdrawal" of a previously completed and issued biological opinion. Even if this were so, that fact would not remove this Court's authority to enjoin any failure on the part of NMFS to comply with the ESA. *See Sierra Club,* 816 F.2d at 1389 (failure to comply with the substan-

tive or procedural provisions of ESA may be redressed through injunctive relief). *See also ONRC v. Bureau of Land Management,* 150 F.3d 1132, 1137 (9th Cir. 1998) (failure to comply with statutory duties is "an exception to the final agency action requirement" under the APA).

In this case, the ESA requires a comprehensive biological opinion addressing the full scope of the FMPs. To the extent BiOp2 remains in place, the Court finds it legally inadequate. To the extent it has been withdrawn, then NMFS has nothing in place that fulfills the dictates of the ESA. Either way, NMFS is in violation of the ESA until such time as a comprehensive biological opinion is in place.

Nor does reinitiation of consultation moot plaintiffs' claim. During consultation or reinitiation of consultation, an agency can take no action that constitutes an irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives. 16 U.S.C. § 1536(d); *Sierra Club v. Marsh,* 816 F.2d at 1389; *Silver v. Babbitt,* 924 F.Supp. at 982–83. Thus, until such time as a comprehensive opinion is in place, this Court retains the authority to determine whether any continuing action violates the ESA and can provide effective relief by enjoining it or remedying its effects.

Accordingly, plaintiffs' claim is not moot because the Court retains the ability to provide effective relief.

### V. Conclusion

More than one year ago NMFS declared it was preparing a comprehensive biological opinion addressing the full scope of the North Pacific groundfish FMPs, as required under the ESA. Having failed to live up to its obligations under the law, NMFS once again invites the Court to withhold judicial review while it undertakes to do what should have been done long ago. The Court declines the invitation.

Defendant's motion to dismiss, docket no. 285, is DENIED. Plaintiffs' motion for summary judgment, docket no. 299, is GRANTED.

IT IS SO ORDERED.